EMMET J. O'BRIEN AND ESTELLE O'BRIEN, HIS WIFE, PLAINTIFFS-APPELLANTS, v. BETHLEHEM STEEL CORPORATION, A CORPORATION, DEFENDANT-RESPONDENT.

Argued January 25, 1971—Decided July 22, 1971.

*Mr. Nathan Baker* argued the cause for appellants (*Messrs. Guarini & Guarini,* attorneys; *Messrs. Baker, Garber, Duffy & Baker,* of counsel).

*Mr. Donald F. Stevens* argued the cause for respondent (*Messrs. Beggans and Stevens,* attorneys; *Mr. Stevens,* of counsel).

The opinion of the Court was delivered by

SCHETTINO, J. This is a negligence action. Plaintiff-husband, Emmet J. O',Brien, fell into an elevator shaft located in a building owned by defendant Bethlehem Steel Corporation. He claimed injuries and brought this suit, charging that defendant's negligent installation, construction and maintenance of the elevator had caused his fall. His wife, Estelle O'Brien, joined to recover her consequential losses. Defendant denied negligence and asserted plaintiff-husband's contributory negligence as a bar to recovery. At the close of plaintiffs' case, defendant rested without producing any evidence on its behalf. The jury returned a verdict of no cause of action in favor of defendant. On appeal, in an unreported *per curiam* opinion, the Appellate Division affirmed the judgment, rejecting plaintiffs' contention that the trial court committed reversible error in its charge to the jury. We granted certification. 57 *N. J.* 137 (1970).

The testimony at trial revealed the following. At the time of the accident, O'Brien was 56 years of age. He had a sight impairment, having no vision except for light in his left eye. O'Brien was employed by the Wackenhut Corporation, which supplied security guards for defendant. In that capacity, O'Brien had worked for approximately two and one-half weeks at defendant's plant and was responsible, among other duties, for inspecting various buildings and areas in the plant complex to "determine that everything was in order." One of these buildings, the Seed Building, is a nine-story warehouse; it is used primarily for storage but also houses the plant engineer's office. O'Brien fell into an elevator shaft located in this building.

The Seed Building elevator is used primarily to move freight. Men accompany the freight and also use the elevator to retrieve materials from the warehouse. Moreover, the building's office personnel regularly use it. The elevator was constructed by the Otis Elevator Company and has a 10,000 lb. capacity. It has two outer calamine steel veneer doors which move in vertical directions and another wooden

sliding door located inside the elevator car. Normally, both sets of doors must be closed to operate the car; and, as we understand it, if the doors at any landing are open, the elevator cannot be moved by using the usual control mechanism. When the outer doors are in a closed position, a latch on the inside of these doors automatically locks them in that position; and, theoretically, this latch prevents the doors from being opened when the elevator is not at that landing. When the latch is disengaged, the outer doors can then be opened manually. As the upper door is raised, the lower door automatically descends to allow ingress to the car. The elevator services all nine floors of the Seed Building, as well as the basement. There is, however, no indicator on the outside of the elevator showing which floor it is on; and, the only indication that the elevator is not at a particular level is that the doors are shut and locked.

On August 21, 1965, the day of the accident, O'Brien was engaged in his inspection duties. According to his testimony, he entered the Seed Building where he was to check the first three floors. When he reached the elevator on the first floor, he found the outer doors "partially opened" and he pushed the upper half up, which automatically lowered the bottom half. Although O'Brien was confronted with nothing but total darkness when the doors opened, he nonetheless stepped forward to get into the elevator. The elevator, however, was not on the first floor, and O'Brien fell 14½ feet to the bottom of the shaft, suffering serious injuries as a result.

O'Brien explained why he stepped unhesitantly into the darkened shaft, saying his conduct was based on his past experience with freight elevators in general and with the Seed Building elevator in particular. From past experience with similar freight elevators, O'Brien stated he relied on the fact that elevator doors on a particular floor level would not be open, and indeed cannot be opened, unless the car is at that level. O'Brien was not alerted to danger by the darkness because he thought this elevator car was always

unlighted except when in actual use. He testified that the same condition had prevailed one week earlier, when he was instructed on his duties by one Dooley, a fellow Wackenhut employee. On that occasion, Dooley had accompanied O'Brien on his first inspection "tour"; led him to the Seed Building; went directly to the elevators, and opened the doors completely; walked into the darkness; switched the light on inside the car and stood at the controls. O'Brien emphasized that when Dooley opened the doors and walked in, the elevator was "pitch black" and "you couldn't see." However, Joseph J. Guider, an employee of defendant whom plaintiff called as a witness, testified that to his knowledge the light inside the elevator car is "on all the time."

At trial, plaintiffs argued that defendant's breach of its duty to provide a reasonably safe elevator was responsible for the accident. Plaintiffs contended that in the context of the facts, defendant's duty was to provide an elevator whose doors at a particular floor level could not be improperly left open when the elevator was not at that level. Plaintiffs claimed that, as a result of defendant's negligent installation, maintenance and construction of the Seed Building elevator, the elevator was defective in this respect; and, as a foreseeable consequence of this negligence, the elevator doors at the first floor level were in a partially open position on the date of the accident, although the elevator car was not at that level.

Plaintiffs called Robert J. Mathis, an employee of defendant and the head of mechanical maintenance for its entire complex at Hoboken, as a witness. Mathis' duties included maintenance of the elevator in the Seed Building. Mathis was working on the date of the accident, had used the elevator to get to his second-floor office shortly before O'Brien's fall and had left it there. Mathis testified that the elevator would not normally move until both the outer doors and the wooden gate were closed. He noted, however, that there were means by which the elevator could be moved without closing the outer doors and by which they could be opened even

though the elevator car was not behind them. First, he testified that inside the car, adjacent to the control panel, was an "override button" which, when depressed, allowed the elevator to operate with the doors open. Although the override button was ostensibly designed to facilitate elevator maintenance work, no peculiar knowledge was required to operate it, and it was visible and easily accessible to anyone using the car. Furthermore, since the outer doors did not close automatically and the person using the elevator had to manually pull them shut to engage the latching device, there was a built-in incentive to use the override button rather than take the safer course of closing the doors. Second, Mathis testified that the doors could be pried open enough to permit a tool to disengage the safety latch inside and thus open the doors. And, finally, Mathis stated that the latch on the first-floor doors, which were used most frequently, had so much "give" that it was even possible to open it without the use of a prying instrument; indeed, Mathis admitted that he, himself, had done so during the course of maintenance work.

Following Mathis' testimony, plaintiffs called Arthur Davis, a licensed architect, as an expert witness. Davis was asked whether the Seed Building elevator, based on Mathis' description and on his own observation, was in conformance with existing State regulations. Davis replied that the Seed Building elevator was not "in conformance with standards and codes in effect in New Jersey." These codes, he said, require that if the elevator doors are open then the car cannot be moved; yet, the override button permitted the operation of the car even though the doors were open. Davis admitted, however, that in certain limited circumstances the function served by an override button is permissible. Those circumstances included allowing the elevator to be raised or lowered a few inches for repair or leveling purposes; but, in the instant case, the button, and its location, permitted the elevator to be moved, not just a few inches above or below the landing for leveling, but to be indiscriminately moved

from one story to another with the doors open at the first floor. Davis also thought that the fact that the door could be opened from the outside by hand and the lock tripped, with the car not there, constituted a violation of the safety standards.

Following the completion of the testimony, the trial court submitted the case to the jury, instructing it generally on the concepts of negligence, contributory negligence and proximate cause. The jury, as we have said, returned a verdict in defendant's favor; and, on this appeal, plaintiffs contend that that verdict was the result of several errors in the trial court's charge.

## I

Plaintiffs' first claim of error relates to that portion of the trial court's charge concerning the applicability of certain State safety regulations to the Seed Building elevator. The trial court permitted the text of *N. J. S. A.* 34:4-1, an elevator safety statute, to be read to the jury:

*Every elevator* moving in a vertical shaft, *used for carrying passengers*, shall have some interlocking device that will automatically prevent the elevator car from being moved in either direction until the shaft door or gate at which the elevator car is standing is closed and securely fastened. (Emphasis added.)

Error is predicated on the court's charge that the jury must decide whether the Seed Building elevator was a "passenger" or "freight" elevator and that only if it was found to be a "passenger" elevator did the statute apply.

Under the undisputed facts in the record, the Seed Building elevator came within the statutory description. The testimony produced at the trial definitely indicated that one of the purposes for which the elevator was used was the carriage of passengers. Guider conceded that the elevator was used extensively for carrying employees, some engaged in moving warehouse materials and other employees who used

the elevator when their mission had nothing to do with carrying property. Mathis, himself, conceded that he used the elevator to get to his second-floor office. The record is clear that other employees used the elevator simply to go from floor to floor, and, indeed, security guards, such as O'Brien, were instructed to, and did, use the elevator in making their inspection tours. This testimony was uncontroverted, and we think it clear that the Seed Building elevator was "used for carrying passengers" within the meaning of the statute. Accordingly, the trial court should have charged the jury that the statute was applicable and that, if it found the elevator doors could be improperly left open at a particular level when the elevator car was not at that level, they could consider this statutory violation evidence of negligence.

There was no warrant then for leaving the question of the statute's application to the jury; and, this portion of the charge, instructing the jury to determine whether the elevator was a "passenger" elevator, was erroneous. The safety statute applies to elevators in general. It does not require that an elevator be exclusively or primarily used for one purpose rather than another; all that is required is that the elevator be "used for carrying passengers." *N. J. S. A.* 34:4-1 was plainly intended to protect persons who were expected to use elevators; and, in view of this purpose, its applicability cannot be made to turn on whether the particular elevator involved is known in the trade as a freight elevator, or is principally used for that purpose.

## II

■ In that portion of its charge dealing with proximate cause, the trial court stated:

The term "proximate" indicates that there must be no other culpable and efficient agency intervening between the defendant's negligence, his dereliction and the injury and damage. An intervening cause is the act of an independent agency which destroys the causal connection between the negligent acts of the defendant and the wrongful injury, the independent act being the immediate cause, in which case,

damages are not recoverable because the original wrongful act is not the proximate cause of the wrongful injury.

\*       \*       \*       \*       \*       \*       \*       \*

[I]t is necessary for the plaintiff to establish \* \* \* the existence of such circumstances as would justify the inference that plaintiff's accident was caused by the wrongful act of the defendant and exclude the idea that it was due to a cause with which this defendant was not connected and for which it was not responsible.

\*       \*       \*       \*       \*       \*       \*       \*

You're instructed that proximate cause is that which produces an injury [directly] or in the natural and normal sequence of the events without the intervention of any independent, intervening cause.

Plaintiffs argue that under the facts adduced in the record, there was no indication of an intervening cause which would relieve defendant of responsibility; and, consequently, they contend that the trial court's charge, permitting the jury to speculate that such a possibility existed, was error.

We agree. The evidence adduced at trial does not suggest any intervening cause; and, it was, therefore, improper for the trial court to permit the jury to speculate that there was one. The charge on intervening cause served to bolster the suggestion of defense counsel in his summation that some unknown third person, not an employee of defendant, might have been responsible for the doors being left open. There was no evidence to support that suggestion and no basis for saying that the behavior of such third person could, in any event, have constituted an intervening cause.

## III

In the Appellate Division and before us, plaintiffs also challenged the following portion of the trial court's charge relating to notice:

[Plaintiff] was an invitee. Now, an invitee is one who is invited or permitted to enter or remain on the land for the purpose of the occupier. He enters by invitation, expressed or implied. In this instance, it was expressed. The owner or occupier of land who, by invitation, expressed or implied, induces persons to come upon his

premises, is under a duty to exercise ordinary care to render the premises reasonably safe for the purposes embraced in the invitation. Thus, he must exercise reasonable care for the invitees' safety to see that he is not injured by any negligent activity and to warn, not only of the dangerous conditions actually known to him, but likewise, of dangerous conditions or defects which he, by the exercise of reasonable care, such as inspection, should or could discover. * * * In this case, there's no proof that prior to the accident, the defendant had actual notice of the existence of the very condition that plaintiff says caused his injury. Accordingly, I charge you that your consideration of this aspect of the case must be directed solely to whether or not plaintiff has established by a fair preponderance of the believable testimony that such condition existed for so long a time as to be in the exercise of reasonable care, capable of discovery and remedy before the occurrence of the accident.

Plaintiffs' thesis with respect to this portion of the charge was that its probable effect was to lead the jury to believe that the "condition" to which the trial judge made reference was the partially open state of the doors on the day of the accident, and to find defendant negligent they must find that the doors were open for such a length of time that defendant should have had notice of it. The trial court's pervasive charge on notice clearly had that tendency and was misleading.

If defendant was negligent because the elevator was defective, defendant could be liable even though it had no knowledge that the elevator doors were in fact open on the day in question. Moreover, defendant would be chargeable with the negligence of any of its employees who left the doors open. Although it is not clear whether plaintiffs expressly advanced this theory, it is so plainly involved that we assume it was in the case. The jury could readily find that the doors were left in that position by defendant's own employees, and that the employees' failure to close the doors constituted negligence imputable to defendant. There was ample evidence in the record which would support such a finding. As mentioned above, the accident occurred on Saturday morning and apparently the only persons present, other than O'Brien, were defendant's employees. Defendant, of course, would be chargeable with the negligence of its em-

ployees whether or not defendant knew of the employees' wrongful act or omission.

## IV

In those portions of its instructions relating to contributory negligence, the trial court charged the jury that:

Now, if you find that contributory negligence upon the part of the plaintiff has been established, a comparative degree of negligence of the parties is immaterial. In other words, it makes no difference *how great* or *how slight* that contributory negligence may have been. The reason for this rule is very simple. It is founded on common sense. The law will not permit anyone to benefit by his wrongdoing. * * * You may not apportion or determine the amount of plaintiff's contributory negligence. If you find that plaintiff was negligent *to any degree* and that such negligence proximately contributed to the happening of the accident, then your verdict must be no cause of action in favor of the defendant.

Under our cases, it is, of course, elementary that a plaintiff's contributory negligence will not operate as a bar to his claim unless it is a substantial factor in bringing about his harm. *Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc. et al.,* 53 *N. J.* 157, 161, 164–165 (1969) ; *Kaufman v. Pennsylvania Railroad Co.,* 2 *N. J.* 318, 323–324 (1949) ; *Maccia v. Tynes,* 39 *N. J. Super.* 1, 6 (App. Div. 1956) ; and, *cf. Restatement, Torts* 2d, § 465. Plaintiffs claim that the trial court's use of the phrases "in any degree" and "how slight" misled the jury in this respect, arguing that their use effectively obviated the jury's obligation to find that O'Brien's negligence, if any, must have proximately contributed to the harm to bar recovery.

In *Prosser, Torts* (3d ed. 1964), § 64, p. 431, Dean Prosser has noted the potential confusion inherent in the use of such phrases, saying:

There is one rather curious but not infrequent aberration which makes an apparent distinction between negligence and contributory negligence. It is said by a number of courts that the plaintiff is barred from recovery if his own negligence has contributed to his

injury "in any degree, however slight." On the face of it this means that any insignificant contribution, such as the addition of a lighted match to a forest fire, would bar the action. In all probability this is nothing more than a confusion of words, which fails to distinguish slight negligence from slight contribution; and what is really meant is that the plaintiff's negligence can be a defense, no matter how slight his departure from ordinary standards of conduct. The intent, in other words, is to reject any idea of comparative negligence. If so, it is a mistake peculiarly likely to mislead the jury when an instruction is given in such terms. Most courts, when the distinction has been pointed out to them, have held that the rules as to causation are the same for contributory negligence as for negligence, and that the plaintiff is not barred unless his negligence, of whatever degree, has been a substantial factor in causing his injury.

In other cases dealing with the propriety of the use of such phrases as "to any extent," "however slight," or "in any degree," our courts have adhered to this distinction. It has been held that such phrases may properly be used to modify negligence, provided the proposition remains clear that a plaintiff's negligence must be found to be a substantial factor in bringing about the harm complained of. *Maccia v. Tynes, supra,* 39 *N. J. Super.* at 6; *Pignatore v. Public Service Coordinated Transport,* 26 *N. J. Super.* 234, 239 (App. Div. 1953); *cf. Formichella v. Layton,* 25 *N. J. Super.* 1, 5–6 (App. Div. 1953). *See generally* Annot., Instructions on Contributory Negligence, 102 *A. L. R.* 411 (1936). We need not decide here whether the jury was probably misled by this instruction; but we recommend that on a retrial of this cause, if any, and in future cases, the use of such phrases be eliminated.

For the foregoing reasons the judgment in favor of defendant is reversed; and, the cause is remanded for further proceedings not inconsistent with this opinion.

FRANCIS, J. (concurring). I concur in the Court's opinion but since the action is going back for retrial I desire to add additional comments on a matter not directly raised on the appeal.

In charging the jury on the subject of contributory negligence the trial court advised them that the comparative

negligence of the plaintiff, Emmet J. O'Brien, and the defendant was immaterial. In other words, if the defendant were 90% at fault and the plaintiff only 10% and that 10% concurred proximately or as a substantial factor in producing the accident, no award could be made to the plaintiff no matter how serious his injuries or how large his out-of-pocket losses. And the defendant, whose negligence was the primary cause of the accident, must go scot-free.

The rule that contributory negligence is a complete bar to recovery was imported into the common law by judges. Whatever may have been the historical justification for it, today it is almost universally regarded as unjust and inequitable to visit an entire accidental loss on one of the parties whose negligent conduct combined with the negligence of the other party to produce the loss. If fault is to remain the test of liability, then the doctrine of comparative negligence which involves apportionment of the loss among those whose fault contributed to the occurrence is more consistent with liability based on a fault premise.

The principle of comparative negligence represents a more just and socially desirable distribution of loss than that ever achieved by the application of the long-standing rule of contributory negligence. I believe also that if comparative negligence were to be made applicable in our State, pre-courthousesteps settlements would be encouraged; there would be more waivers of jury trial; trial delays would be less of a problem; and calendars would be less clogged.

Since the present bar of contributory negligence is judge-made law, our authority to humanize that law by adopting comparative negligence is not open to reasonable question, and the time seems ripe to make the change. See Haugh, "Comparative Negligence: A Reform Long Overdue," 49 *Ore. L. Rev.* 38 (1969); Lambert, "The Common Law is Never Finished (Comparative Negligence on the March)," 32 *ATL L. J.* 741, 760–71 (1968); Symposium, "Comments on Maki v. Frelk — Comparative v. Contributory Negligence: Should the Court or Legislature Decide?" 21 *Vand. L. Rev.*

889 (1968). At least 12 states have adopted a form of comparative negligence rule: Arkansas (*Ark. Stats. Ann.* § 27-1730.1.2 (1962)), Georgia (*Ga. Code Ann.* § 105-603 (1968)), Hawaii (*H. R. S.* § 663-31 (1969 supp.)), Maine (14 *M. R. S. A.* § 156 (1970-71 supp.)), Massachusettts (*Mass. Ann. Laws* C. 231, § 85 (1970 supp.)), Minnesota (*Minn. Stats.* § 604.01 (1971 supp.)), Mississippi (*Miss. Code Ann.* § 1454 (1956)), Nebraska (*Neb. Rev. Stat.* § 25-1151 (1964)), New Hampshire (*N. H. Rev. Stats, Ann.* § 507:7a (1970 supp.)), South Dakota (*S. D. Code* § 20-9-2 (1967)), Vermont (*Vt. Stats. Ann. T.* 12, § 1036 (1970 supp.)), Wisconsin (*Wis. Stat. Ann.* § 895.045 (1966)). See *Maki v. Frelk,* 40 *Ill.* 2d 193, 239 *N. E.* 2d 445, 450 (1968) (dissenting opinion).

I realize that there are varying formulas for application of the comparative negligence rule, and that it would be helpful for policy reasons if the Legislature would choose among them, as has been done in the 12 states mentioned.[1] But to date that body has not been moved to act. Thus we are free to select a fair formula which has been in operation for some years, such as that of Wisconsin, cited above. The rule there is:

> Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death, or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering.

the administration of this rule is discussed in the 1967 Report of the New Jersey Supreme Court Committee on Comparative Negligence, pp. 6-7. A simple special verdict procedure is codified in the Wisconsin Act (*Wis. Stats. Ann.* § 270.27 (1971-72 supp.)); see Heft and Heft, "Compara-

---

[1] The three different types of statutes commonly in use may be found in Arkansas, Mississippi and Wisconsin, cited *supra.*

tive Negligence: Wisconsin's Answer," 55 ABA J. 127, 129 (1969); and see the procedure set forth in the 1969 Hawaii statute, *supra, Act 227 (Session Laws of Hawaii,* 1969 Reg. Sess.), Section 663 (b), (c) ;[2] *Bissen v. Fujii,* 51 *Haw.* 636, 466 *P.* 2d 429, 433 (1970). Of course, the Wisconsin rule, if adopted here, would be subject to change by our Court or by the Legislature, if experience demonstrated such a need.

Since the present case is being remanded for retrial, I see no reason why either party may not raise the issue of comparative negligence at the retrial by submission of a request to charge on the subject. Although at the trial now under review the court charged out comparative negligence, no objection was made thereto, and the issue was not argued in the briefs on this appeal.

Justice Proctor joins in this concurring opinion.

FRANCIS and PROCTOR, JJ., concur in result.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.

---

[2] The Hawaii statute, *supra,* provides that in any action where it is applicable the jury shall return a special verdict which shall state:

(1) The amount of the damages which would have been recoverable if there had been no contributory negligence; and

(2) The degree of negligence of each party, expressed as a percentage.

Upon return of the special verdict, "the court shall reduce the amount of the verdict in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made, provided, however, that if the said proportion is equal to or greater than the negligence of the person against whom recovery is sought, then, in such event, the court will enter a judgment for the defendant."