MICHAEL ROMAN, AN INFANT BY HIS GUARDIAN AD LITEM CAROL ROMAN, AND CAROL ROMAN, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. ROBERT M. MITCHELL, JR., SHERMAN WADE, JR. AND N. SALVATERRA CONSTRUCTION COMPANY, A CORPORATION OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued November 13, 1979—Decided March 13, 1980.

338

*Leonard F. Rappa* argued the cause for appellants (*Monica* and *Rappa*, attorneys).

*David Lustbader* argued the cause for respondent Robert M. Mitchell, Jr. (*Philip M. Lustbader* and *David Lustbader*, attorneys; *Susan L. Moreinis* on the brief).

*Edward J. Gilhooly* argued the cause for respondents Sherman Wade, Jr. and Salvaterra Construction Company.

The opinion of the Court was delivered by

SULLIVAN, J.

The suit herein is a tort action filed on behalf of Michael Roman, the infant plaintiff herein, for serious injuries sustained by him in an accident on the New Jersey Turnpike. His mother Carol Roman has joined in the suit.

On September 29, 1973, Michael, then 12 years old, and three young companions pushed their bicycles up on an embankment adjacent to the southbound lanes of the New Jersey Turnpike near Linden and onto the shoulder of the road. They then pedaled a short distance on the shoulder in a southerly direction to a Howard Johnson's restaurant located in a Turnpike service area where they had something to eat. On their way back to where they had entered the Turnpike and while proceeding along the shoulder, they were stopped by a state trooper. According to the trooper, he told told the boys to leave the highway immediately. However, the boys testified at trial that the trooper simply told them "to get off where we had come on."

The trooper did not stay to see to it that the boys followed instructions; instead, he responded to a traffic problem a short distance away. Almost immediately after the officer left and while the boys were still standing on the shoulder, a dump truck owned by Robert M. Mitchell, Jr., and being driven south on the Turnpike by Sherman Wade, lost its two left rear wheels. One of the wheels careened across the roadway onto the shoulder where the boys were standing and struck Michael, seriously injuring him.

At the time, both Mitchell and Wade were employed by the Salvaterra Construction Co., Mitchell as a mason foreman and Wade as a laborer. Salvaterra periodically used Mitchell's truck in its construction work with Mitchell as the operator. On the date of the accident, however, Mitchell had given Salvaterra permission to use the truck and it was being driven by Wade to a Salvaterra construction site when the wheels came off.

Plaintiffs' suit for damages joined Mitchell, Wade and Salvaterra Construction Co. as defendants. At the commencement of the trial, which was limited to the issue of liability, counsel for plaintiffs sought leave to ask the following questions of prospective jurors on their *voir dire* examinations.

1. Are any of you stockholders or employees of any insurance company which is engaged in the casualty insurance business?

2. Are any of you engaged in the general insurance agency business or are any of you an agent for a casualty insurance company?

3. Have any of you ever worked as a claims investigator or insurance adjuster?

The trial judge denied the request, observing that "you might just as well tell (the jury) now you know the defendant is insured in this case."

At the trial on liability, Mitchell testified that the truck was in his possession 99% of the time and it was, more or less, his responsibility to make sure that the truck was in working order. As a rule, he inspected the lug nuts on the wheels of the vehicle every two or three weeks, but could not remember whether he had made such an inspection within the week preceding the accident. He said that under his arrangement with Salvaterra, inspection and maintenance of the vehicle were his responsibility.

Plaintiffs' expert testified that the standard for safety inspection of wheel lugs on a construction vehicle used on rough terrain with heavy loads required examination "perhaps once a day, once every few days" of use. He expressed the opinion that prior to Wade's driving the truck on the day of the accident, most probably one or more of the lug nuts on the left rear wheels had loosened, causing stresses during use which in turn caused the other lug nuts to loosen or break.

After describing the details of the accident, the infant plaintiff testified that prior to the accident he knew that the Turnpike was a dangerous place for bicyclists and that he had been warned not to ride on heavily traveled streets.

On motion, at the close of evidence, the trial court dismissed the case as to defendants Wade and Salvaterra Construction Co. on the ground that plaintiffs had failed to produce any evidence of negligence on their part.

The accident had occurred a few weeks after the effective date of the New Jersey comparative negligence statute, *N.J.S.A.* 2A:15–5.1 *et seq.*, and the case was tried under the provisions of that act. Since construction of the statute is a primary issue in the case, its provisions are set forth in full.

*N.J.S.A.* 2A:15–5.1

Contributory negligence shall not bar recovery in any action by any person or his legal representative to recover damages for negligence resulting in death or injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages sustained shall be diminished by the percentage sustained of negligence attributable to the person recovering.

*N.J.S.A.* 2A:15–5.2

In all negligence actions in which the question of liability is in dispute, the trier of fact shall make the following as findings of fact:

a. The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence, that is, the full value of the injured party's damages;

b. The extent, in the form of a percentage, of each parties' negligence. The percentage of negligence of each party shall be based on 100% and the total of all percentages of negligence of all the parties to a suit shall be 100%.

c. The judge shall mold the judgment from the finding of fact made by the trier of fact.

*N.J.S.A.* 2A:15–5.3

The party so recovering, may recover the full amount of the molded verdict from any party against whom such recovering party is not barred from recovery. Any party who is so compelled to pay more than such party's percentage share may seek contribution from the other joint tortfeasors.

After the trial court refused to strike the defense of contributory negligence, holding that a jury question was presented, counsel for plaintiffs requested that the jury be charged as to the legal effect of the application of the comparative negligence statute. In essence, the request to charge asked that the jury be

told that for the infant plaintiff to recover, the jury would have to find that the defendant's percentage of negligence was greater than that of the plaintiff, and that the damages awardable to the infant must be diminished in proportion to the amount of negligence attributable to him. The request was denied.

In response to interrogatories submitted to it by the court, the jury found that the accident was caused by the negligence of both the infant plaintiff and defendant Mitchell. It fixed the percentage of negligence of the infant plaintiff at 75% and that of Mitchell at 25%. Based on these findings the trial court molded the verdict and entered judgment for the defendant. *N.J.S.A.* 2A:15–5.2(c).

The Appellate Division affirmed the judgment in favor of defendant finding no error in any of the rulings made by the trial court. 165 *N.J.Super.* 68 (1979). Certification was granted by this Court. 81 *N.J.* 254 (1979). We now reverse and order a new trial.

## I.

We agree with the trial court that there was sufficient evidence of Michael's contributory negligence to submit that issue to the jury pursuant to the comparative negligence statute. He deliberately ventured onto the shoulder of the Turnpike knowing that it was a dangerous place for a cyclist and in spite of prior warnings not to ride his bike on heavily traveled streets. Despite his age, Michael was aware of the risks involved and deliberately placed himself in an area of extreme danger. A jury reasonably could have found that his venturing onto the shoulder of the roadway was a proximate cause of the accident.[1]

---

[1]The additional contentions that the infant plaintiff was also contributorily negligent (1), in failing to obey the trooper's order to leave the turnpike immediately and (2), in taking his eyes off the wheels and watching the skidding truck, lack a sufficient basis in the record. The accident happened almost immediately after the trooper left and while the boys were still

*Dziedzic v. St. John's Cleaners and Shirt Launderers, Inc.,* 53 *N.J.* 157 (1969), cited by plaintiffs, does not support plaintiffs' contention that Michael's presence on the shoulder of the road was not a proximate cause of the accident. See *Latta v. Caulfield,* 79 *N.J.* 128, 133–135 (1979).

## II.

We conclude that the trial court erred in granting the motion of defendant Salvaterra Construction Co. for an involuntary dismissal. The basis for the dismissal was the court's conclusion that Mitchell as owner of the vehicle had a duty to make safety inspections of the lug nuts on the wheels and that Salvaterra had no legal obligation in that regard.

However, evidence was presented that a vehicle such as here involved should have had its lug nuts inspected "perhaps once a day, once every few days." While Mitchell as owner had assumed the responsibility of making safety inspections of the vehicle, including the wheel lug nuts, this did not relieve Salvaterra of the independent duty to check the vehicle prior to use. Certainly Salvaterra, who was engaged in the construction business, should have been aware that the wheel lug nuts on a heavy dump truck will tend to loosen when the vehicle is subjected to the stresses and strains of construction operation. However, the same knowledge cannot be imputed to Wade. The record indicates that he was employed as a laborer and that this was the first time he had driven the Mitchell truck. Mr. Salvaterra testified that, when he hired Wade, he did not know if he was qualified or experienced in the driving of construction

---

standing on the shoulder. To suggest that young Roman might have been able to avoid the careening wheel had he kept his eyes on it, rather than on the truck, is pure speculation. In any event, we conclude that the jury verdict, fixing the percentage of negligence of the infant plaintiff at 75%, was contrary to the weight of the evidence.

trucks and that he did not give Wade any training in that regard. In these circumstances we do not see how a jury reasonably could have found that Wade had an independent obligation to inspect the vehicle prior to driving it.

## III.

We next consider the denial of plaintiffs' request that the jury be instructed as to the legal effect of the application of the comparative negligence statute to the jury's findings. There is nothing in the statute which specifically requires that the jury be instructed as to such effect—an ultimate outcome charge. All that the statute provides is that the judge shall mold the judgment from the findings of fact made by the jury. *N.J.S.A.* 2A:15–5.2(c). However, plaintiffs argue that unless the jury is made aware of the legal effect of its findings as to percentages of negligence, such findings may be premised on an erroneous concept of the law and can result in a molded judgment far different from that intended by the jury. In this very case it has been suggested that the jury may well have concluded that its findings of the infant plaintiff's negligence quota of 75% and defendant Mitchell's 25% would result in a monetary verdict for plaintiff for 25% of the damages found.

■ We believe the contention has merit and that a jury in a comparative negligence situation should be given an ultimate outcome charge so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates. Prior to the adoption of the comparative negligence statute when the contributory negligence of a plaintiff was an absolute bar to recovery in this State, a jury was instructed as to the outcome of its findings, by a charge that it if found contributory negligence to any substantial degree, its verdict must be for the defendant. See *O'Brien v. Bethlehem Steel Corporation*, 59 *N.J.* 114, 124 (1971).

We recognize that some states with comparative negligence statutes have rejected the notion that an ultimate outcome charge be given. See *McGowan v. Story*, 70 *Wis*.2d 189, 234 *N.W*.2d 325 (Sup.Ct.1975). The reason given is that since a jury's function is fact finding, it should have no interest in determining how the law should be applied to the facts found; otherwise, a jury, motivated by bias or sympathy, might attempt to manipulate the apportionment of negligence to achieve a result that may seem desirable to it. Possible confusion of the jury has also been mentioned.

There is considerable support for this position. See *Heft and Heft, Comparative Negligence Manual*, § 7.40 (1978); *Schwartz, Comparative Negligence*, § 17.5 at 291 (1974). However, a growing number of comparative negligence jurisdictions now provide for ultimate outcome instructions in comparative negligence situations by legislative provision, court rule or judicial decision. See, *e. g., Loup-Miller v. Brauer & Assoc.-Rocky Mountain*, 572 *P*.2d 845, 847 (Ct.App.Colo.1977) (legislative amendment to statute); *Porche v. Gulf Mississippi Marine Corp.*, 390 *F.Supp.* 624 (E.D.La.1975) (judicial decision); *Krengel v. Midwest Automatic Photo Inc.*, 295 *Minn.*, 200, 203 *N.W*.2d 841, 848 (Sup.Ct.1973) (court rule).

A detailed discussion of the trend in favor of an ultimate outcome instruction in comparative negligence cases is included in *Seppi v. Betty*, 99 *Idaho* 186, 579 *P*.2d 683, 688–692 (Sup.Ct. 1978), which held that in most cases an ultimate outcome instruction would be fully warranted, but that a trial court would have discretion not to so inform the jury in a complex case where such instructions would tend to confuse or mislead the jury.

We conclude that, ordinarily, a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function. Hereafter, an ultimate outcome instruction should be given to a jury in such a trial. However, in a complex case involving multiple issues and numerous parties, the trial

court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury. See *Seppi, supra,* 579 *P.*2d at 692.

■ Our holding will not result in juries deciding comparative negligence cases according to whim or fancy. The trial court can always set aside a jury's findings if it concludes that the verdict is the product of misunderstanding, bias or prejudice. As noted in *Seppi, supra,* "[t]his is a much more effective way to control the problems of misunderstanding and bias in jury verdicts than attempting to blindfold the jury." 579 *P.*2d at 692.

## IV.

Finally we consider the rejection of plaintiffs' proposed *voir dire* questions to prospective jurors concerning their stockholding or employment in a company engaged in the casualty insurance business. Plaintiffs are entitled to a fair and impartial jury and, facially, the proposed questions are designed to ascertain possible bias or prejudice on the part of a prospective juror where casualty insurance coverage is involved.

In this State the *voir dire* questioning of prospective jurors is regulated by statute, *N.J.S.A.* 2A:78-4, and by court rule, *R.* 1:8-3(a). Both the statute and the rule allow the judge to control the scope of inquiry and in practice it is the judge who does the questioning. See *State v. Manley,* 54 *N.J.* 259, 282-283 (1969). On the *voir dire,* a prospective juror's employment or occupation may be inquired into and invariably, as here, the jurors are also asked whether they know of any reason why they "could not act fairly and impartially as judges of the facts in this case." It has not been the practice in this State to allow specific questioning of prospective jurors as to possible stockholding or employment in an insurance company absent some indication that a basis therefor exists.

■ True, the average juror may be aware that there is insurance coverage in almost every motor vehicle accident case

and the disclosure of such coverage to a jury has been held not to be prejudicial error. *Runnacles v. Doddrell*, 59 *N.J.Super.* 363 (App.Div.1960). However, the questions here propounded tend to emphasize unduly the fact of insurance coverage. Absent some indication that a basis for asking them exists, they should ordinarily be rejected by the trial court. The risk is that, if permitted, such questions would be used, not as a bona fide inquiry into possible bias or prejudice, but solely to stress the fact of insurance coverage to the jury.

Plaintiffs argue that unless these questions are permitted they cannot know whether a juror is biased. However, the inquiry, even if in good faith, can prejudice a defendant's right to a fair trial. The better rule is to leave the matter to the sound discretion of the trial judge who should balance the plaintiff's claim of need and the basis therefor against the possibility of prejudice to the defendant. We are aware of *Kiernan v. Van Schaik*, 347 *F*.2d 775 (3 Cir. 1965), which holds that questions such as these should be allowed in accident cases. The opinion indicates that possible prejudice to defendants can be avoided by an adequate caution to the jury

* * *  that these questions do not imply either that any defendant is insured or that the matter of insurance or lack of insurance is to be considered in reaching a verdict. [*Id.* at 782.]

*Kiernan* would appear to bar the trial judge from exercising any discretion in the matter and require that such questions be asked even if no basis therefor has been shown. This approach, we think, could unduly prejudice a defendant's rights. The harm is not so much in the jury being made aware of insurance coverage as in the undue stress on such fact, and its possible influence on the jury's findings. The better rule, as heretofore

indicated, is to leave the matter to the trial judge's sound discretion.

Reversed and remanded for a new trial.

PASHMAN, J., dissenting in part.

I concur in Parts I, II and III of the majority opinion. I respectfully dissent, however, from Part IV of that opinion which holds that the trial judge properly refused to question prospective jurors on *voir dire* examination as to their connections with insurance companies.

Although *N.J.S.A.* 2A:78–4 and *R.* 1:8 ·3(a) afford the trial judge board discretion in controlling the scope of *voir dire* examination, see *State v. Manley*, 54 *N.J.* 259, 281–283 (1969); *cf. State v. McCombs*, 81 *N.J.* 373, 379 (Pashman, J., concurring), I believe that the court below mistakenly exercised that discretion in refusing to ask the questions relating to insurance. By upholding this result, the majority has subverted the fundamental purpose of *voir dire* examination: "to elicit information for the purpose of determining whether or not to interpose a peremptory challenge, and of disclosing whether or not there is a cause for challenge." *N.J.S.A.* 2A:78 -4.

The majority has prevented these and all plaintiffs from discovering a source of bias that is potentially present in nearly all tort litigation. They are thus denied an essential aid for making successful challenges for cause and for intelligently exercising peremptory challenges. This denial carries severe implications for a plaintiff's right to have his cause tried by an

impartial jury. It also impermissibly impinges upon the plaintiff's ability to utilize effectively his peremptory challenges. Although not constitutionally based, see *State v. Singletary*, 80 *N.J.* 55, 62 (1979), the right of peremptory challenge has been granted by the Legislature and this Court to insure that the triers of fact will be "as nearly impartial 'as the lot of humanity will admit.'" *State v. Jackson*, 43 *N.J.* 148, 158 (1964), *cert.* den. *sub nom. Ravenell v. New Jersey*, 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965) (quoting *State v. White*, 105 *N.H.* 159, 196 *A.*2d 33, 34 (Sup.Ct.1963), *cert.* den. 379 *U.S.* 854, 85 *S.Ct.* 103, 13 *L.Ed.*2d 57 (1964)); see *N.J.S.A.* 2A:78–7(a); *R.* 1:8–3(c). "The denial of the right of peremptory challenge is the denial of a substantial right." *Wright v. Bernstein*, 23 *N.J.* 284, 295 (1957); see also *State v. Singletary*, 80 *N.J.* at 62. When such denial is not waived by conduct, it is *per se* prejudicial. *Wright v. Bernstein*, 23 *N.J.* at 295.

As a general rule it has been held in other jurisdictions that jurors may be questioned on *voir dire* respecting their interest in or connection with liability insurance companies, provided that counsel acts in good faith.[1] See generally Annot., 40 *A.L.R.Fed.* 541, 562 (1978); Annot., 4 *A.L.R.*2d 761, 792 (1949). Good faith

[1]Counsel has been permitted to inquire into the prospective juror's connection with the insurance industry, see, *e. g.*, *Wichmann v. United Disposal, Inc.*, 553 *F.*2d 1104 (8th Cir. 1977); *Milwaukee Gear Company v. Charles Benjamin, Inc.*, 466 *F.*2d 588 (3d Cir. 1972); *Kiernan v. Van Schaik*, 347 *F.*2d 775 (3d Cir. 1965), or any connection with the insurance company interested in the outcome of the specific case, see, *e. g.*, *Jones v. Crawford*, 361 *So.*2d 518 (Ala.Sup.Ct.1978); *Chrisler v. Holiday Valley, Inc.*, 580 *S.W.*2d 309 (Mo.Ct.App.1979). Courts have also allowed questioning on whether individual jurors are policyholders of a mutual insurance company involved in the case, see, *e. g.*, *Borkoski v. Yost*, 594 *P.*2d 688 (Mont.Sup.Ct.1979), or even whether they believed that the size of jury verdicts in personal injury cases affected automobile liability insurance premiums, see, *e. g.*, *King v. Westlake*, 572 *S.W.*2d 841 (Ark.Sup.Ct.1978).

requires that any examination of jurors must not be designed to inform them that someone other than the defendant will pay any judgment. 21 J. Appleman, *Insurance Law and Practice*, § 12815 at 780 (1962).

The Court today maintains that specific questioning of prospective jurors "as to possible stockholding or employment in an insurance company" is inappropriate "[a]bsent some indication that a basis therefor exists." *Ante* at 347-348. In essence, the majority requires that counsel demonstrate his good faith by some *prima facie* showing of one or more jurors' connections with the business of insurance before asking whether he had been employed by a casualty insurance company.

This rule places a nearly impossible burden on counsel who seek to have these questions asked on *voir dire*. Apart from *voir dire* examination itself, the sole source of juror information available to counsel is the prospective juror list. As presently designed, it provides but scant information on the juror's residence and occupation. Designations such as "clerk," "secretary" or "accountant" reveal nothing pertinent to counsel's concerns. Unless a juror described his own occupation as, for example, "claims adjuster" or "insurance," the list would afford no indication of any connection with the insurance industry. Nor does the list indicate whether a juror is a stockholder of an insurance company, or has been associated with the insurance business in the past. Thus as a practical matter, counsel can persuade the court to question prospective jurors as to their ties to the insurance business only if counsel already has the answers. Under the majority's view, *voir dire* examinations become little more than an empty formality. Counsel is unable to use the procedure to discover information crucial for selecting an impartial jury. See *N.J.S.A.* 2A:78-4.

Although a prospective juror's occupation may ordinarily be inquired into on *voir dire*, the majority fails to explain how counsel may uncover a juror's stock ownership in an insurance

company. "It is not enough * * * to grant the rights of peremptory challenge and challenge for cause and then limit the factual basis for their use to the visible appearance of the jurors and the scant information on the jury list of their residence and occupation." *Kiernan v. Van Schaik*, 347 *F*.2d 775, 781 (3d Cir. 1965). Apparently the majority considers it sufficient that each juror is asked "whether [he or she] know[s] of any reason why [one] 'could not act fairly and impartially as judges of the facts in this case.'" *Ante* at 328. I do not believe that a prospective juror is so alert to his own prejudices that he would reveal his ties to the insurance business in response to such a general question. *Cf. United States v. Dellinger*, 472 *F*.2d 340, 367 (7th Cir. 1972), cert. den. 410 *U.S.* 970, 93 *S.Ct.* 1443, 35 *L.Ed.*2d 706 (1973).

The primary reason that the Court today restricts the *voir dire* inquiry is the belief that such questions unduly stress the fact of insurance coverage, thus possibly influencing the jury's findings. See *ante* at 348. I consider it unlikely that questions relating to insurance would so unavoidably emphasize the fact of coverage as to induce jurors to render excessive verdicts. "[T]he general prevalence of liability insurance for automobile injuries is known to the jurors;[2] hence, for the law to forbid any disclosure of it in the course of the trial seems to be merely a piece of hypocritical futility." 2 J. Wigmore, *Evidence*, § 282a at 146 (3d ed. 1940) (footnote added). I agree with the position taken by the United States Court of Appeals of the Third Circuit in *Kiernan v. Van Schaik, supra :*

---

[2]Indeed, insurance companies have themselves resorted to media advertising to remind members of the public of the widespread incidence of liability insurance. Cognizant, no doubt, of the public's service on civil juries, insurers also call attention to an asserted relationship between jury verdicts and general premium levels. There is little danger that a judge will prejudice a jury by informing it of what insurance companies publicly advertise.

[T]he inquiry whether a prospective juror is a stockholder or employee of a casualty insurance company or is employed as a claims investigator or insurance adjuster, or is an insurance company agent, is relevant in ascertaining bias against one claiming damages for negligence. * * * Such a relevant matter may not be shut out because it deals with insurance. The word "insurance" is not outlawed from the courtroom as a word of magical evil. Jurors are not unaware that insurance is at large in the world and its mention will not open to them a previously unknown realm. * * * The court has wide control over the *voir dire* and can adequately safeguard the inquiry by explaining to the jurors the limited scope and purpose of the examination and thus eliminate any implication of the existence or relevance of insurance in the case before it. [347 *F.*2d at 782 (footnote omitted)]

The majority's perspective dates from an earlier time. "When the rule against disclosure of insurance originated doubtless the existence of such protection for defendants was exceptional and a 'hush, hush' policy could be effective." McCormick, *Evidence,* § 201 at 481 (2d ed. 1972). Today, however, liability insurance coverage is a commonplace fact of life. "It is time for a reappraisal of this insurance bugaboo. * * * This insurance rule, built upon the theory of prejudice against corporations and especially insurance corporations, has largely outlived its purpose and its justification." *Causey v. Cornelius,* 164 *Cal.App.*2d 269, 330 *P.*2d 468, 472 (Dist.Ct.App.1958). The majority errs by failing to realize that the danger to plaintiffs of jurors biased towards insurance companies is probably as great as the danger to defendants that a jury will be corrupted by the passing mention of the word "insurance." To avoid this equally likely source of prejudice, the balance must be struck in favor of open interrogation. See J. Wigmore, *Evidence, supra,* § 282a at 146–147.

The method by which the insurance questions are posed to the jury can go far towards lessening any possible prejudicial impact. For example, the entire venire could be examined when they are first assembled, before a panel is drawn for any particular case. See Comment, 52 *Harv.L.Rev.* 166 (1938). The trial court could later caution the jurors that such questions do

not imply that a defendant is insured or that the presence or absence of coverage is to be considered in reaching a verdict. See *Kiernan v. Van Schaik*, 347 *F.*2d at 782. The most desirable and least threatening solution to this problem would be the inclusion of insurance-related information in the prospective juror list. A trial court could then properly refuse *voir dire* examination regarding a juror's insurance ties unless that list indicated their existence.

In summary, plaintiffs should be able to discover any prospective juror's connections with the insurance business during the selection process. Only then will counsel have an adequate opportunity to interpose challenges for cause successfully and exercise peremptory challenges with informed prudence. I would therefore hold that the trial court erred in refusing to grant plaintiff's request to question prospective jurors during *voir dire* examination.

Chief Justice WILENTZ and Justice SCHREIBER join in this dissent.

CLIFFORD, J., dissenting in part.

I join in the Court's judgment reversing and remanding for a new trial and in the opinion's treatment of the infant plaintiff's contributory negligence, the liability of the respective defendants, and, with a minor caveat, the insurance-related voir dire questions to prospective jurors. It is with regard to the propriety of an "outcome" instruction that I part company with the majority.

I

The Court holds that "ordinarily, a jury [should be] informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial * * * ." *Ante* at 327. We are told that such information will better enable a jury "to fulfill its fact-finding function", *ibid.*, without being told how or why this is so. I doubt that it is.

The first section of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1, provides that in negligence actions for personal injuries a plaintiff's contributory fault will not bar recovery if that fault "was not greater than the negligence of the person against whom recovery is sought." Instead, the plaintiff's damages are diminished by the percentage of fault attributable to him.

It is the next section of the Act, *N.J.S.A.* 2A:15–5.2, that addresses the judge's and jury's respective roles in applying this statutory principle. That section reads as follows:

> In all negligence actions in which the question of liability is in dispute, the trier of fact shall make the following as findings of fact:
> a. The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence, that is, the full value of the injured party's damages;
> b. The extent, in the form of a percentage, of each parties' [sic] negligence. The percentage of negligence of each party shall be based on 100% and the total of all percentages of negligence of all the parties to a suit shall be 100%.
> c. The judge shall mold the judgment from the finding of fact made by the trier of fact.

It is clear that the statute contains no explicit prohibition against the trial court informing the jurors of what effect their findings will have on the ultimate outcome of the case. Nevertheless is seems equally clear to me that the sense of the statutory language is that the jury now has a precisely limited function: to determine, on the basis of answers to specific questions, the extent of fault of the parties, *not* the extent of defendant's liability for damages. The latter, under subsection c. above, devolves upon the judge. Where, as here, the law we deal with was created not by the courts but by the legislature, we should respect the considerable effort made by the legislature to spell out those separate functions.

Supportive of this approach is the circumstance that our Comparative Negligence Act is patterned after the comparative

negligence statute of Wisconsin, *Wis.Stat.Ann.* § 895.045 (West Supp.1978), whose Supreme Court has rejected "outcome" instructions. *E. g., Kobelinski v. Milwaukee & Suburban Transport Corp.,* 56 *Wis.*2d 504, 202 *N.W.*2d 415 (1972). A statute taken from another state is ordinarily adopted with the prior constructions placed on it by the highest court of the parent jurisdiction; it comes laden with the hereditary baggage of that court's decisions. See *Woodward v. Haney,* 564 *P.*2d 844, 845 (Wyo.Sup.Ct.1977); 2A *C. Sands, Sutherland Statutory Construction* § 52.02 (4th ed. 1973). New Jersey courts have adhered to this principle in interpreting the Act now before us in *Suter v. San Angelo Foundry & Machine Co.,* 81 *N.J.* 150, 161 (1979); *Warshany v. Supermarkets General Corp.,* 161 *N.J.Super.* 515, 521 (Law Div. 1978). It is, then, significant to note the Wisconsin Supreme Court's "fundamental rule" that it is reversible error for either the court or counsel to inform the jury of the effect of their answers to the comparative negligence questions on the ultimate result in the case. *Kobelinski v. Milwaukee & Suburban Transport Co., supra,* 202 *N.W.*2d at 425.

The reason for this rule is found in a later decision in which the Wisconsin Supreme Court explained that

> the jury is the finder of fact and it has no function in determining how the law should be applied to the facts found. It is not the function of a jury in a case between private parties on the determination of comparative negligence to be influenced by sympathy for either party, nor should it attempt to manipulate the apportionment of negligence to achieve a result that may seem socially desirable to a single juror or to a group of jurors. [*McGowan v. Story,* 70 *Wis.*2d 189, 198, 234 *N.W.*2d 325, 329 (1975).]

See also *Avery v. Wadlington,* 526 *P.*2d 295 (Colo.Sup.Ct.1974).

In *Avery, supra,* the trial court refused to allow any explanation or comment to the jury on the effect of its determination of the parties' respective degrees of fault under a comparative

negligence statute much like our own. Plaintiff, who was found to be 70% negligent, argued on appeal that "outcome" instructions and comment should be permitted. The Supreme Court of Colorado rejected this contention, emphasizing that the enactment "divides the responsibility for a fair and good result between the jury and the judge", 526 *P.*2d at 297, and thereby "enhances the chance of a pure verdict on material facts alone." *Id.* It concluded that the language in the Colorado statute, similar to that found in *N.J.S.A.* 2A:15–5.2, "mandates in precise language" that the jury is the fact-finder and "as such simply answers questions posed to it in the special verdict form" after being instructed with reference to this function. 526 *P.*2d at 297. On the other hand the trial court's role is to apply the statutory law to the jury's findings of fact and thereby bring about the ultimate result through entry of the judgment.

> Under this system, it is not the jury's function to attempt to control the effect of the law of comparative negligence in their special findings. Jury involvement is thus greatly simplified and a pure verdict is more readily attainable. The only law which the jury members need to understand is the law which enables them to answer the specific questions asked of them in the special verdict form. Under this system, it is unnecessary for the jury to concern itself with how much the plaintiff receives or whether the plaintiff receives anything. [*Id.*] 1

---

1Whether in response to this determination is not revealed, but the Colorado legislature sharply altered its comparative negligence statute to provide specifically that "the trial court shall instruct the jury on the effect of its finding as to the degree of negligence of each party." In addition, the attorneys for each party were henceforth permitted "to argue the effect of the instruction on the facts which are before the jury." *Colo.Rev.Stat.*, § 13–21–111(4) (1976 Cum.Supp.). Following this revision the Colorado trial courts have, of course, given "outcome" instructions, and it has been held reversible error where such a charge has not been furnished. *Appelgren v. Agri Chem, Inc.*, 562 *P.*2d 766, 767 (Colo.Ct.App.1977); *Loup-Miller v. Brauer & Associates-Rocky Mountain, Inc.*, 572 *P.*2d 845, 847 (Colo.Ct.App.1977).

Whatever merit may inhere in the cases going the other way, *e. g., Seppi v. Betty*, 99 *Idaho* 186, 579 *P.*2d 683 (1978); *Thomas v. Board of Township Trustees*, 224 *Kan.* 529, 582 *P.*2d 271 (1978), and in this Court's determination today, must give way to the perceived intention of the legislature. Therefore I would hold that neither instructions nor comments on the outcome should be permitted in a comparative negligence case.

## II

There remains to explain the "minor caveat" attached to my agreement with the majority's treatment of the insurance-related voir dire questions to prospective jurors. The Court points out, *ante* at 347:

> In this State the *voir dire* questioning of prospective jurors is regulated by statute, *N.J.S.A.* 2A:78–4, and by court rule, *R.* 1:8–3(a). Both the statute and the rule allow the judge to control the scope of inquiry and in practice it is the judge who does the questioning. See *State v. Manley*, 54 *N.J.* 259, 282–283 (1969).

It is with the practice of the judge questioning the prospective jurors almost exclusively and with the attorneys participating only on the rarest of occasions that I disagree.

To the extent that the statute, *N.J.S.A.* 2A:78–4, speaks to the question at all, it suggests that the attorneys will be permitted to address the jurors. This, as might be expected, is within limits set by the trial court. The enactment provides, in pertinent part:

---

Similarly, both Minnesota and Wyoming experienced drastic changes of position on whether a jury could be informed of the consequences of its special verdicts, the former by way of amendment to its court rules of civil procedure following a statutory change. (*Compare McCourtie v. United States Steel Corp.*, 93 *N.W.*2d 552, 562–63 (Minn.Sup.Ct.1958) *with Krengel v. Midwest Automatic Photo, Inc.*, 203 *N.W.*2d 841, 848 (Minn.Sup.Ct.1973)); and the latter by reason of legislative action, see *Woodward v. Haney*, 564 *P.*2d 844, 846 (Wyo.Sup.Ct.1977). As to a similar development in Kansas, see 16 *Washburn L. J.* 114 (1976), and 18 *Washburn L. J.* 606 (1979).

> Upon the trial of any cause, civil or criminal, all parties may, within the discretion of the court, question any person summoned as a juror, after his name is drawn from the box and before he is sworn as a juror, and without the interposition of any challenge, to elicit information for the purpose of determining whether or not to interpose a peremptory challenge, and of disclosing whether or not there is cause for challenge. \* \* \* Such questions shall be permitted for the purpose of disclosing whether or not the juror is qualified, impartial and without interest in the result of the action. The questioning shall be conducted under the supervision and control of the trial judge and in open court.

Our Rule of Court, however, makes it unmistakably clear that the role of the attorney in jury selection is to be severely restricted. *R.* 1:8–3(a), governing examination of jurors, reads in part as follows:

> For the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box after the required number are drawn without placing them under oath. The parties or their attorneys may supplement the court's interrogation in its discretion.

As explained in Pressler, *Current N.J. Court Rules*, Comment *R.* 1:8–3, the practice since the adoption of the Rule in 1969 has been for the trial court to consider the attorneys' requests that certain specific questions be posed or that particular attitudes, opinions or potential biases be proved. While *State v. Manley*, 54 *N.J.* 259 (1969), does not entirely foreclose supplementary questioning by counsel after the court has completed its interrogation, nevertheless that case cautions that the "discretionary portion" of *R.* 1:8–3(a) must be administered with the exercise of "considerable restraint." 54 *N.J.* at 282. In actual practice this restraint amounts to an almost total prohibition of direct questioning by counsel to jurors and direct responses. It is with this prohibition that I disagree.

Initially I must point out that I discern in the trial bar no reservoir of resentment over the present practice, nor among my colleagues any groundswell of enthusiasm for scrapping the rule in favor of a system whereby attorneys may, as prior to 1969,

conduct their own examination of prospective jurors—always, of course, under the firm control of the trial court. Since the Rule went into effect more than a decade ago, a whole new generation of trial lawyers has appeared on the scene. In all likelihood the majority of trial judges have been appointed since the effective date of the rule. Active practitioners probably have more pressing problems to occupy their time than the mounting of a persuasive and well-documented campaign through petition to the appropriate Supreme Court committee, looking to a revision in the Rule, even if they do happen to favor one. In short, those most directly concerned may be of the view that things are going along just swimmingly under the present system. While the practice is not put in issue in the present case, and while there is no apparent sentiment either within or without the Court favoring a change, I nevertheless take this opportunity briefly to state my view of why the present practice strikes me as wrong. In thus struggling against the tide I make no effort to marshal either the empirical data or supporting authorities (assuming there are any) required for a successful frontal attack, today's exercise being more in the nature of an incidental reflection.

In sum my view is that a party is deprived of an important right when his attorney is foreclosed in practical effect from conducting significant and relevant dialogue with a prospective juror. I do not for a moment suggest that proper dialogue would permit the attorney to make sweeping declarations, masquerading as questions, such as amount to "trying the case" on voir dire. The trial court can and should nip this sort of thing in the bud. But the very purpose of the voir dire examination is, as the statute tells us, "to elicit information for the purpose of determining whether or not to interpose a peremptory challenge, and of disclosing whether or not there is cause for challenge." *N.J.S.A.* 2A:78-4. The right to elicit that information by "question[ing] any person summoned as a juror" is given to "all parties." *Id.* That right is severely restricted—impermissibly, I

suggest—by what too often amounts to "boiler plate" interrogation of the prospective jurors through the trial court, with only sparingly-granted supplementation.

One question of a juror very often gives rise to further inquiry, based on details of the case known to trial counsel but not available to the court at the jury selection stage. It seems to me plain silly to suggest either that significant time is saved or that the requisite flow of information from prospective juror to counsel is aided when the trial judge monopolizes the interrogation process and in the course thereof has to weigh (with one eye firmly fixed on this Court's stern admonition of "considerable restraint") whether to pose any additional questions suggested by the lawyers.

Furthermore, a party is entitled to the visceral reaction of the trial attorney to the prospective juror, and especially to the attorney's appraisal of the venireman's visceral reaction to him, to the extent that it may be divined. This is difficult to identify and articulate, and the tendency to exaggerate it in some considerable degree is no doubt endemic to the trial bar; but it is nonetheless real, it is valuable, and it should be taken into account.

With jury selection forcefully supervised by the trial bench and buttressed by unmistakable appellate decisions supporting such supervision, I would think the ills said to have been encountered under the pre-Rule system, see *Manley, supra*, 54 *N.J.* at 276, 281, could be accommodated without depriving the parties of the basic right—one which the present practice diminishes to an unacceptable degree. True, as anyone with even a nodding acquaintance with judicial administration recognizes, innovative approaches to a myriad of vexatious problems besetting the courts are required lest the judicial machinery become so clogged as to become unworkable. The applause for the imaginative steps that mark New Jersey's progress in the direction of more efficient administration of justice is well deserved. But if in fact our present practice facilitates the jury

selection process—a proposition that is at least questionable—then I count the cost of what is being sacrificed on the altar of expediency as too great.

Justice SCHREIBER joins in Part I of this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.