713 A.2d 427

NANCY WEISS, EXECUTRIX OF THE ESTATE OF RUSSELL M. WOOD, AND NANCY WEISS, EXECUTRIX OF THE ESTATE OF CHRISTINE WOOD, AND ROBERT E. WOOD, INDIVIDUALLY AND NANCY WEISS, INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. IRVIN GOLDFARB, M.D.; W.R. CHENITZ, M.D.; BASSAM HADDAD, M.D.; MARY LEE DOE, R.N. (A FICTITIOUS NAME); GUY DOE, R.N. (A FICTITIOUS NAME); JANE SMITH, R.N. (A FICTITIOUS NAME); DONALD RUBINSTEIN, M.D.; AMER AL–ZARKA, M.D.; ADOLF SENFT, M.D.; CECIL MATTHEWS, M.D.; EDWARD MANZELLA, M.D.; MICHAEL GUMA, M.D.; A. JOSEPHINE VILLANUEVA, R.N.; A. JOSE DAIRO, L.P.N.; LILY MATULAC, R.N.; R. BARCELONA, R.N.; AND JANE MOE I–V (A FICTITIOUS NAME), DEFENDANTS, AND ST. MICHAEL'S MEDICAL CENTER AND ANGELINA FORSHAGE, R.N., DEFENDANTS–APPELLANTS.

Argued February 2, 1998—Decided June 16, 1998.

*Patrick J. Hughes,* argued the cause for appellants (*Connell, Foley & Geiser,* attorneys; *Ernest W. Schoellkopff,* on the briefs).

*Arthur L. Raynes,* argued the cause for respondents (*Wiley, Malehorn and Sirota,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this medical malpractice case is whether a jury should receive an ultimate outcome instruction that, at the time of the alleged malpractice, the Charitable Immunity Act, *N.J.S.A.* 2A:53A–8, limited a hospital's liability to no more than $10,000. The trial court declined to give such an instruction. The Appellate Division in a published opinion concluded that the instruction should have been given. 295 *N.J.Super.* 212, 231–32, 684 *A.*2d 994 (1996). We granted St. Michael's petition for certification, limited to the question of the ultimate outcome instruction. 150 *N.J.* 26, 695 *A.*2d 669 (1997).

We reverse and hold that an ultimate outcome instruction should not be given to a jury concerning the statutory limitations of a hospital's liability.

I

On June 19, 1989, Russell M. Wood was admitted to St. Joseph's Medical Center (St. Joseph's) in Paterson, New Jersey for treatment of heart disease and chronic renal failure. At the time, he

was sixty-seven years old and suffered from long-term hypertension and various coronary and renal problems. Wood was diagnosed as suffering from non-sustained ventricular tachycardia, atrial fibrillation, and chronic kidney failure. An angiogram revealed some blockage of a coronary artery. He was placed on a heart monitor and began receiving dialysis treatments on a three-day-a-week schedule, remaining on the heart monitor during the treatments. Wood's cardiologist recommended the performance of electro-physiologic cardiac studies. Because St. Joseph's did not have the equipment needed to perform those studies, Wood was transferred to defendant St. Michael's Medical Center (St. Michael's) on Thursday, July 13, 1989.

Upon Wood's arrival at St. Michael's, he was immediately admitted to the telemetry unit where he was connected to a cardiac monitor under continuous supervision. Wood missed his Friday, July 14, dialysis treatment, and his doctor arranged to have that treatment provided the next day. Wood was taken to the dialysis unit about noon that Saturday, July 15. He arrived unconnected to a cardiac monitor, notwithstanding that no order had been written in his chart discontinuing the monitor. Although the dialysis unit was equipped with a cardiac monitor, Wood was never connected to it.

During dialysis treatment on July 15, Wood's vital signs remained normal from approximately 12:30 p.m. through 2:00 p.m. At 2:25 p.m., however, a nurse found Wood unresponsive with no blood pressure. Despite being successfully resuscitated, he sustained irreversible brain damage as a result of the loss of oxygen and remained in a coma until his death on August 28, 1989. Plaintiff's experts opined that had his heart been monitored during the dialysis treatment, the cardiac arrest could have been avoided altogether or counteracted in time to avoid brain damage.

Plaintiff instituted the present litigation against St. Michael's, two dialysis nurses, two residents who had attended decedent in the telemetry unit, and all the attending doctors, Drs. Rubenstein, Goldfarb, Senft, Haddad, and Chenitz. Prior to trial, partial summary judgments were granted dismissing Dr. Chenitz and the

two residents. Following the close of plaintiff's case, her claims against Dr. Goldfarb and the two dialysis nurses were dismissed pursuant to *Rule* 4:37–2(b). The case was submitted to the jury against St. Michael's and Drs. Rubenstein, Senft, and Haddad. As noted previously, the trial court denied plaintiff's request to inform the jury that St. Michael's liability was capped at $10,000.

The jury returned a verdict finding no cause of action against the doctors, but finding the hospital negligent. The jury awarded total damages of $150,000. The trial court molded the verdict and entered judgment for $10,000 based on the Charitable Immunity Act. Plaintiff's subsequent motion for a new trial was denied. She appealed several court rulings, including the denial of her request to give an ultimate outcome charge to the jury.

The Appellate Division affirmed the partial summary judgments in favor of Drs. Chenitz and the two residents. 295 *N.J.Super.* at 220, 684 *A.*2d 994. It also affirmed the dismissal of the complaint against Dr. Goldfarb and one of the nurses. *Id.* at 221–22, 684 *A.*2d 994. The court reversed the dismissal of the claim against Nurse Forshage at the end of plaintiff's case. *Id.* at 227, 684 *A.*2d 994. It also reversed the jury's verdict of no cause of action in favor of Dr. Haddad. *Id.* at 226–27, 684 *A.*2d 994. The court affirmed the judgment of liability against St. Michael's and the amount of the damages award of $150,000. *Id.* at 233, 684 *A.*2d 994. The court determined that plaintiff was entitled to an ultimate outcome charge instructing the jury on the limitation on St. Michael's liability. *Id.* at 232, 684 *A.*2d 994. It remanded the case for a new trial on liability only against Dr. Haddad and Nurse Forshage. *Id.* at 233, 684 *A.*2d 994. The retrial, however, would require apportionment of liability if either Dr. Haddad or Nurse Forshage was found liable. Therefore, the case against St. Michael's was remanded as well for apportionment purposes. *Id.* at 228, 684 *A.*2d 994.

## II

St. Michael's argues that the Appellate Division's decision impermissibly interferes with its legislatively created limited immu-

nity under the Charitable Immunity Act. The hospital asserts that by ordering an ultimate outcome charge on the statutorily limited liability, the decision conflicts with the holding in *Johnson v. Mountainside Hospital*, 239 *N.J.Super.* 312, 571 *A.*2d 318 (App. Div.), *certif. denied*, 122 *N.J.* 188, 584 *A.*2d 248 (1990).

St. Michael's maintains that an ultimate outcome charge is distinguishable from similar charges given in comparative negligence cases and the lost-chance line of cases following *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1990), because the charge in the present case does more than merely advise the jury of the legal effect of its findings. St. Michael's argues that in comparative negligence and *Scafidi*-type cases, the ultimate outcome charge guides a jury in its essential function of apportioning responsibility for the total injury involved. The hospital maintains that its legislatively mandated limitation on liability is irrelevant to the role of the jury as fact-finder.

Plaintiff maintains that *Johnson, supra*, was wrongly decided and is contrary to the holding of *Roman v. Mitchell*, 82 *N.J.* 336, 413 *A.*2d 322 (1980), that required an ultimate outcome charge in comparative negligence cases. Plaintiff expresses concern that in situations in which, as in this case, both the hospital and individuals employed by it are represented by the same attorney, that in the absence of an ultimate outcome instruction, an attorney will attempt to misguide the jury into finding liability against only the hospital because of the hospital's statutorily limited liability.

III

-A-

The Charitable Immunity Act was enacted by the Legislature in response to *Benton v. Y.M.C.A.*, 27 *N.J.* 67, 141 *A.*2d 298 (1958), *Collopy v. Newark Eye & Ear Infirmary*, 27 *N.J.* 29, 141 *A.*2d 276 (1958), and *Dalton v. St. Luke's Catholic Church*, 27 *N.J.* 22, 141 *A.*2d 273 (1958), which overruled judicially declared immunity for certain charitable organizations. In 1959, subsequent to the *Collo-*

*py* trilogy of cases, the Legislature passed *N.J.S.A.* 2A:53A–8, which provides charitable immunity for nonprofit hospitals for negligence liability exceeding $10,000. The statute states:

> [A]ny nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $10,000.00, together with interest and costs of suit, as the result of any 1 accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $10,000.00 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor.
>
> *[N.J.S.A.* 2A:53A–8.1]

The constitutionality of the statute, which is not before us, was upheld in *Edwards v. Our Lady of Lourdes Hospital,* 217 *N.J.Super.* 448, 526 *A.*2d 242 (App.Div.1987). The Legislature expressed the purpose of the Charitable Immunity Act as follows:

> This act shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.
>
> *[N.J.S.A.* 2A:53A–10.]

In furtherance of that purpose, this Court has held that the Act must be liberally construed to provide immunity for the protection of nonprofit corporations organized for religious, charitable, educational, or hospital purposes. *Schultz v. Roman Catholic Archdiocese of Newark,* 95 *N.J.* 530, 537–38, 472 *A.*2d 531 (1984). New Jersey is in the small minority of jurisdictions that have either partially or wholly retained the doctrine of charitable immunity. *See* Janet Fairchild, Annotation, *Tort Immunity of Nongovernmental Charities–Modern Status,* 25 *A.L.R.4th* 517, 539–46 (1983); *see, e.g., Williams v. Jefferson Hosp. Ass'n,* 246 *Ark.* 1231, 442 *S.W.*2d 243 (1969); *Purcell v. Mary Washington Hosp. Ass'n,* 217 *Va.* 776, 232 *S.E.*2d 902 (1977).

---

[1] The statute was amended effective July 31, 1991, to raise the outer limit of a hospital's liability to $250,000. L.1991, *c.* 187, § 48.

Massachusetts has statutorily limited recovery against a charitable organization to $20,000. *Mass. Gen. Laws* ch. 231, § 85K (1985). Although the Massachusetts law is very similar to New Jersey's, its case law does not directly address whether juries should be apprised of the limited liability of charitable entities. *See, e.g., Harlow v. Chin*, 405 *Mass.* 697, 545 *N.E.*2d 602, 612–13 (1989) (finding that although trial court did not make specific finding, it was on notice that hospital was charitable organization; trial court should have entered judgment against hospital limited by statutory cap). Similarly, other states have not addressed the issue.

The two federal cases relied on by the dissent do not support an ultimate outcome instruction. *Post* at 490–91, 713 *A.*2d at 439. Unlike the present case, those cases required the jury to resolve factual issues concerning statutory damages.

In *In re Aircrash in Bali, Indonesia*, 871 *F.*2d 812 (9th Cir. 1989), relatives of Pam Am Airline passengers sought to recover more than the $75,000 limitation imposed by the Warsaw Convention (Convention). *Id.* at 814. To achieve that goal, plaintiffs sought to persuade a jury that the airline engaged in willful misconduct or that it failed to notify its passengers of the $75,000 Convention limitation. *Id.* at 814 n. 1. The damage limitation was placed before the jury in order for it to perform its role as factfinder. *Id.* at 815. *Vinieris v. Byzantine Maritime Corp.*, 731 *F.*2d 1061 (2d Cir.1984), involved a jury trial for civil penalties, pursuant to 46 *U.S.C.A.* § 596, based on a ship captain's alleged failure to pay earned wages to a seaman. *Id.* at 1062. The Court of Appeals held that because the jury had to decide whether the captain violated the statute by acting arbitrarily, unreasonably or willfully, he should have been permitted to testify that he had personal knowledge of the substantial statutory penalties, thereby inferring that he would not have violated the statute. *Id.* at 1064. Here, too, the statutory damages were placed before the jury because that information was essential to the jury's fact-finding

role. In the present case, the statutory damages are irrelevant to the jury's role.

-B-

Plaintiff's claims against the multiple defendants that each was negligent and that such negligence proximately contributed to the death of the decedent, required the jury to apportion the total negligence between all defendants found liable. Such apportionment implicates the comparative negligence statute, *N.J.S.A.* 2A:15–5.1 to –5.3. Plaintiff's request for an ultimate outcome instruction concerning the hospital's limited liability was based on the ultimate outcome charge used in comparative negligence and lost-chance cases.

This Court first allowed an ultimate outcome instruction in a comparative negligence context in *Roman v. Mitchell, supra,* 82 *N.J.* at 345, 413 *A.*2d 322. There, the Court concluded that, in a comparative negligence case, the jury should be informed of the legal effect of its findings. *Ibid.* Noting that the comparative negligence statute made no mention of whether juries should be informed of the statute's legal effect, the Court held that the jury "should be given an ultimate outcome charge so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates." *Ibid.*

The Court reasoned that an ultimate outcome jury instruction was not a novelty in the jurisprudence of negligence. Prior to the adoption of our comparative negligence statute, a plaintiff's contributory negligence was a complete bar to recovery if it proximately contributed to the occurrence of an accident. *Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc.,* 53 *N.J.* 157, 161, 164–65, 249 *A.*2d 382 (1969); *Kaufman v. Pennsylvania R.R. Co.,* 2 *N.J.* 318, 323–24, 66 *A.*2d 527 (1949). In such cases, the jury was given an ultimate outcome instruction that if it found contributory negligence on the part of a plaintiff to any degree that proximately contributed to the happening of the accident, the legal

effect of that finding obligated the jury to return a verdict in favor of the defendant. *Roman, supra,* 82 *N.J.* at 345, 413 *A.*2d 322; *O'Brien v. Bethlehem Steel Corp.,* 59 *N.J.* 114, 124, 279 *A.*2d 827 (1971). Moreover, the *Roman* Court noted that requiring an ultimate outcome instruction was consistent with the trend in other jurisdictions. *Roman, supra,* 82 *N.J.* at 346, 413 *A.*2d 322.

When the Court in *Roman* acknowledged that an ultimate outcome instruction prevents a jury from applying a mistaken notion of how a statute works, and when it agreed with plaintiff that the jury probably intended that plaintiff recover 25% even though it found plaintiff 75% negligent, the Court by implication based its decision to require an ultimate outcome instruction partly on the fact that New Jersey had adopted a modified rather than a pure comparative negligence statute. *N.J.S.A.* 2A:15–5.1; *Van Horn v. William Blanchard Co.,* 88 *N.J.* 91, 94, 438 *A.*2d 552 (1981). The New Jersey comparative negligence statute provides that a contributorily negligent plaintiff may recover, "if such negligence was not greater than the negligence of the person against whom recovery is sought." *N.J.S.A.* 2A:15–5.1. "New Jersey has a 'modified' comparative negligence system, as distinguished from a 'pure' system under which 'a plaintiff may recover even if his negligence is greater than the negligence of the adverse tortfeasor,' with the recovery 'diminished by his degree of contributory negligence.' " *Van Horn, supra,* 88 *N.J.* at 94–95, 438 *A.*2d 552 (citation omitted).

The *Roman* Court relied on decisional law of Idaho, a state that also has a modified comparative negligence statute. In *Seppi v. Betty,* 99 *Idaho* 186, 579 *P.*2d 683 (1978), the court stated:

A jury uninformed about the precise working of the Idaho comparative negligence law, when presented with questions asking them to apportion the negligence between the parties and to fix the total amount of damages, is likely to assume that the plaintiff's recovery will be reduced in proportion to his negligence. In such situation the Idaho comparative negligence rule, which bars recovery if the plaintiff's negligence is 50% or more, poses a trap for the uninformed jury.... In the case where it is clear that both parties were negligent to some extent, a 50–50 allocation of negligence is singularly attractive to a jury.... Thus, the uninformed jury could easily deceive itself into believing that it has decided that the defendant

should pay for half of the plaintiff's damages when in fact it has determined that the plaintiff will recover nothing at all.

[*Id.* 579 *P.*2d at 690.]

The Court in *Roman* used the Idaho Supreme Court decision as an interpretive aid for our comparative negligence statute because both states had adopted a modified version of comparative negligence that drove the ultimate outcome instruction decision. *See Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 161, 406 *A.*2d 140 (1979).

The concern about an uninformed jury is not critical in a pure comparative negligence jurisdiction because the jury would be correct in assuming that a plaintiff's recovery simply would be reduced by the extent of that plaintiff's negligence. Thus, the *Roman* decision was appropriate under New Jersey's modified comparative negligence statute because in order to make an informed apportionment of fault, the jury needed to know that a plaintiff would not recover if that plaintiff was determined to be more negligent than a defendant from whom recovery was sought.

Following the decision in *Roman*, the Court in *Fischer v. Canario*, 143 *N.J.* 235, 670 *A.*2d 516 (1996), held that in *Scafidi*-type-lost-chance cases, the jury should be given an ultimate outcome instruction. *Id.* at 254–55, 670 *A.*2d 516. *Scafidi* lost-chance cases are those involving a defendant's negligence that has combined with a preexisting condition to cause harm. Because those types of cases require use of the "substantial factor" standard of causation rather than the "but for" standard, *Anderson v. Picciotti*, 144 *N.J.* 195, 206–07, 676 *A.*2d 127 (1996), the legal principles that inform the determination of causation with respect to damages are quite similar to those involved in making the percentage of negligence determination under the comparative negligence statute. *Ibid.; Scafidi, supra,* 119 *N.J.* at 113, 574 *A.*2d 398. The comparison in *Scafidi*-type cases is between the preexistent condition and defendant's conduct to arrive at the lost chance or apportionment of responsibility on a percentage basis. The rationale is based on simple justice.

In a *Scafidi*-type case, as with comparative negligence, " 'a tortfeasor should be charged only with the value of the interest he [or she] destroyed.' " *Scafidi, supra,* 119 *N.J.* at 112, 574 *A.*2d 398 (quoting Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 *Yale L.J.* 1353, 1356 (1981)).

[*Anderson, supra,* 144 *N.J.* at 207, 676 *A.*2d 127.]

*Fischer* required an ultimate outcome instruction so that the jury would know the legal effect of the apportionment of causation. *Fischer, supra,* 143 *N.J.* at 254, 670 *A.*2d 516. The apportionment is made between the harm caused by a defendant's negligent medical treatment and that caused by the patient's preexisting medical condition. *Id.* at 241, 670 *A.*2d 516. Once the jury has measured the lost chance on a percentage basis, the judge is required to " 'mold the verdict to limit defendant's liability to the value of the lost chance for recovery attributable to defendant's negligence.' " *Id.* at 241–42, 670 *A.*2d 516 (quoting *Scafidi, supra,* 119 *N.J.* at 114, 574 *A.*2d 398). In requiring an ultimate outcome charge, the Court in *Fischer* feared that without it, the jury would mistakenly reduce the damages award to reflect its apportionment of responsibility and the trial court would again reduce the damages when molding the verdict.

*Johnson v. Mountainside Hospital, supra,* 239 *N.J.Super.* 312, 571 *A.*2d 318, presented the identical legal issue raised in the present case. There, the plaintiff's wife died when her respirator was accidentally disconnected while receiving medical treatment at Mountainside Hospital. *Id.* at 317–18, 571 *A.*2d 318. Suit was instituted against the hospital and several hospital employees. *Id.* at 318, 571 *A.*2d 318. The jury found the manufacturer of the respirator 80% negligent and the hospital liable for 20% of the total damages awarded, which equaled $96,250. *Id.* at 319, 571 *A.*2d 318. Based on the Charitable Immunity Act, however, the hospital's liability was reduced to $10,000. *Ibid.* Plaintiff argued on appeal that the jury should have been given an ultimate outcome instruction. *Id.* at 319–20, 571 *A.*2d 318.

The purpose of that requested jury instruction in *Johnson* and the present case was the same: to counteract defendant's per-

ceived trial strategy of casting the blame, if any, for decedents' deaths upon the hospitals which had statutorily limited liability while shielding the individual defendants who had unlimited liability exposure. *Id.* at 325, 571 *A.*2d 318.

In rejecting the request for an ultimate outcome instruction, the court in *Johnson* stated:

> If the requested instruction was to have any effect upon a jury's verdict, it could only be to persuade the jury to shift to the other defendants some amount for which it had concluded the hospital, and not the other defendants, was justly responsible. By the enactment of *N.J.S.A.* 2A:53A–8, the legislature determined that, as a matter of social policy, an injured beneficiary of the hospital's works, can *shift only a limited share of the consequences* of the hospital's negligence to the hospital itself. But there is no reason to believe that a purpose of the statute was to shift any part of those consequences to other parties merely because they happen to be caught up in the same law suit as the hospital. We agree with the trial judge that a charge leading to that result would be unfair and inappropriate. In that respect, we think that the situation presented by this case is different from situations in which an ultimate outcome charge has been held to be required. *See Roman v. Mitchell,* 82 *N.J.* 336, 345–347, 413 *A.*2d 322 (1980); *Dimogerondakis v. Dimogerondakis,* 197 *N.J.Super.* 518, 485 *A.*2d 338 (Law Div.1984).
>
> [*Id.* at 325–26, 571 *A.*2d 318.]

## IV

We agree with the holding in *Johnson* and its reasoning. Neither *Roman* nor *Fischer* supports an ultimate outcome charge that informs a jury that a defendant hospital has statutorily limited monetary liability. Both *Roman* and *Fischer* were limited to comparative fault situations.

In a comparative fault situation, the jury is required to express the relative culpability of the defendants in terms of percentages. Because New Jersey does not have a "pure" comparative fault system, the ultimate outcome instruction was required so that the jury would not deliberate on the percentages of fault under some mistaken notion of how the statute that controlled its deliberations worked. Without such a charge, the jury could mistakenly assume that a finding that plaintiff was sixty percent negligent and defendant was forty percent negligent would allow plaintiff to recover forty percent.

The type of charge involved here focuses on money and not percentages of fault. The model jury charge in comparative negligence cases properly informs the jury how to handle damages. It provides that any assessment of damages for a plaintiff's injuries "should be made irrespective of which party is at fault or to what degree, or who is to ultimately pay damages to be assessed." *Model Jury Charge (Civil)*, 8.22, "Comparative Negligence–Interrogatories," (pre–1985).

Furthermore, for more than three-quarters of this century our courts have held that in negligence cases, it is improper to inform the jury whether the defendant is insured or uninsured. *Sutton v. Bell*, 79 *N.J.L.* 507, 510, 77 *A.* 42 (E. & A.1910). Where, .as in the present case, the issue before the jury is the negligence of the defendant, whether a monetary verdict is collectable or a defendant has insurance is irrelevant to the jury. *Brandimarte v. Green*, 37 *N.J.* 557, 562–63, 182 *A.*2d 562 (1962); *Haid v. Loderstedt*, 45 *N.J.Super.* 547, 550–52, 133 *A.*2d 655 (App.Div.1957). More recently, even in the trial of verbal threshold cases before a jury to determine whether a plaintiff's alleged injuries qualify under that statute, *N.J.S.A.* 39:6A–8a, our courts have held that it is improper to mention verbal threshold insurance coverage. *Demers v. Snyder*, 282 *N.J.Super.* 50, 58, 659 *A.*2d 495 (App.Div. 1995); *Pickett v. Bevacqua*, 273 *N.J.Super.* 1, 5–6, 640 *A.*2d 1173, (App.Div.1994). References to insurance can prejudice a defendant by suggesting that the defendant did not care whether proper care was exercised because the insurance company would pay if found to be at fault. A reference to coverage might even suggest that a larger award may be appropriate because a "deep pocket" is available. On the other hand, if a defendant is uninsured, that may engender sympathy for that defendant to the prejudice of the plaintiff.

Consistent with the principle that juries in negligence cases not be informed regarding the insured status of a defendant, our public policy has prohibited counsel in negligence cases from requesting a jury to return a damage award in a specific amount.

*Botta v. Brunner,* 26 *N.J.* 82, 102–104, 138 *A.2d* 713 (1958). Although the strictures of *Botta* have been modified by *Rule* 1:7–1(b) to permit argument to the jury "that unliquidated damages be calculated on a time-unit basis," reference to a specific sum may not be made.

Complementary to our decisional law and court rules precluding arguments for or against a specific sum in negligence cases, the Legislature has also addressed the issue. As part of its 1995 tort reform, L.1995, *c.* 142, § 9, the Legislature directed that "[t]he jury shall not be informed of the cap on punitive damages established by section 6 of this act." *N.J.S.A.* 2A:15–5.16. The cap was fixed at "five times the liability of that defendant for compensatory damages or $350,000, whichever is greater." L.1995, *c.* 142, § 6, codified at *N.J.S.A.* 2A:15–5.14b. Because a hospital can be subject to a potential claim for punitive damages, *Perna v. Pirozzi,* 92 *N.J.* 446, 461, 457 *A.2d* 431 (1983); *Edwards, supra,* 217 *N.J.Super.* at 459, 526 *A.2d* 242; *Seiderman v. American Inst. for Mental Studies,* 667 *F.Supp.* 154, 160–61 (D.N.J.1987), we believe that the 1995 legislative proscription against divulging caps to juries is relevant in the present case.

In view of the foregoing legal principles, an ultimate outcome charge, based on the Charitable Immunity Act, in a negligence suit against a hospital is not only irrelevant but has the clear potential of being highly prejudicial. We are convinced that the prejudicial effect of such an instruction could be to shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital. We find persuasive the hospital's argument that informing a jury about a hospital's limited liability is akin to telling a jury whether a defendant is insured and the amount of coverage and is at least as prejudicial as telling it about insurance coverage. Such a prejudicial effect would be the antithesis of what *Roman* and *Fischer* anticipated. Informing a jury of the liability cap also violates the legislative policy expressed in the Charitable Immunity Act of protecting nonprofit hospitals and the Legislature's desire to

withhold from juries the existence of statutory limits on monetary awards.

Finally, we find unpersuasive plaintiff's assertion that an ultimate outcome charge is especially needed when the same defense attorney represents the hospital and its employees. A hospital can only act through its agents, servants and employees. *Schultz, supra,* 95 *N.J.* at 538, 472 *A.*2d 531. Thus, a hospital can only be vicariously liable. Consequently, if each defendant-employee of a hospital was represented by separate counsel, he or she would perhaps more vigorously seek to shift responsibility to the capped defendant, the hospital. Despite plaintiff's view to the contrary, defense counsel vigorously asserted that neither the hospital nor any of its employees had been negligent in treating Mr. Wood.

That portion of the judgment of the Appellate Division requiring an ultimate outcome jury instruction is reversed. As modified, the matter is remanded to the Law Division for retrial as ordered by the Appellate Division.

STEIN, J., dissenting.

In this medical malpractice case tried to a jury, the jury determined that St. Michael's Hospital's negligence was a proximate cause of the death of plaintiff's decedent, and returned a damages verdict against the Hospital in the amount of $150,000. The jury also returned a verdict of no cause of action in favor of Doctors Rubenstein, Senft, and Haddad. On appeal, the Appellate Division ruled that the trial court erred in dismissing plaintiff's claims against Nurse Forshage at the close of plaintiff's case, and that because of trial error the verdict in favor of Dr. Haddad must be set aside and a new trial ordered. 295 *N.J.Super.* 212, 222, 684 *A.*2d 994 (App.Div.1996). Although preserving the damages verdict of $150,000, the court ordered a retrial of liability against Dr. Haddad, Nurse Forshage, and St. Michael's Hospital. *Id.* at 228, 684 *A.*2d 994. The Appellate Division also held that on retrial the jury should be informed that pursuant to the provisions of the Charitable Immunity Act then in effect, *N.J.S.A.* 2A:53A-8, the

Hospital's liability could not exceed $10,000 no matter what relative proportion of fault is assigned to it by the jury. *Id.* at 229–30, 684 *A.*2d 994.

We granted certification, 150 *N.J.* 26, 695 *A.*2d 669 (1997), limited to the question whether the Appellate Division properly required an ultimate outcome charge. The Court now disapproves of the proposed instruction, concluding that the charge, much like a reference to insurance coverage, improperly focuses the jury's attention on the collectibility of the verdict. Although the issue is a close one, I disagree with both the Court's reasoning and with its conclusion.

## I

Both the Court's and the Appellate Division's opinions agree that the most influential New Jersey precedents bearing on the ultimate outcome charge issue are *Roman v. Mitchell,* 82 *N.J.* 336, 413 *A.*2d 322 (1980), and *Fischer v. Canario,* 143 *N.J.* 235, 670 *A.*2d 516 (1996), but the opinions disagree sharply about the inferences and conclusions to be drawn from those decisions.

In *Roman, supra,* damages were sought on behalf of a twelve-year-old plaintiff who, while standing with his bicycle on the shoulder of the New Jersey Turnpike after being stopped by a state trooper, was seriously injured when a dump truck being driven on the Turnpike lost its two left rear wheels, one of which careened across the roadway onto the shoulder causing serious injuries to the plaintiff. 82 *N.J.* at 340, 413 *A.*2d 322. The plaintiff's suit joined as defendants Mitchell, the truck's owner; Wade, the driver; and Salvaterra Construction Co., Mitchell's employer, who had been authorized by Mitchell to use the truck on the day of the accident. Loose lug nuts on the truck's rear wheels apparently caused the accident, and Mitchell acknowledged responsibility for checking the lug nuts to make certain they were secure. At trial the plaintiff testified and acknowledged that he knew prior to the accident that the Turnpike was unsafe for

bicyclists and that he had been cautioned not to ride on roads with high traffic volume.

Prior to the jury verdict, the plaintiff's counsel requested that the jury be instructed essentially that "for the infant plaintiff to recover, the jury would have to find that the defendant's percentage of negligence was greater than that of the plaintiff, and that the damages awardable to the infant must be diminished in proportion to the amount of negligence attributable to him." *Id.* at 342–43, 413 *A.*2d 322. The trial court denied the request. The jury apportioned twenty-five percent of the fault for the accident to defendant Mitchell and the remaining seventy-five percent to the plaintiff. Accordingly, the trial court entered judgment for Mitchell as required by the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.2(c). Following the Appellate Division's affirmance of the judgment below, this Court, in an opinion by Justice Sullivan, reversed and remanded for a new trial. *Id.* at 343. The Court held that the trial court erred in granting Salvaterra Construction Co.'s motion for involuntary dismissal, concluding that a jury could find that Salvaterra had an independent duty to check the safety of the truck prior to use. *Id.* at 344. In addition, the Court held that the jury's apportionment of seventy-five percent of fault to the infant plaintiff was contrary to the weight of the evidence. *Id.* at 343 n. 1.

On the ultimate outcome charge issue, the Court acknowledged the plaintiff's contention that

> unless the jury is made aware of the legal effect of its findings as to percentages of negligence, such findings may be premised on an erroneous concept of the law and can result in a molded judgment far different from that intended by the jury. In this very case it has been suggested that the jury may well have concluded that its findings of the infant plaintiff's negligence quota of 75% and defendant Mitchell's 25% would result in a monetary verdict for plaintiff for 25% of the damages found.
>
> [*Id.* at 345.]

This Court concluded that in comparative negligence cases a jury should be given an ultimate outcome charge "so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates."

*Ibid.* The Court observed that "ordinarily, a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function." *Id.* at 346. The Court also noted that "[t]his is a much more effective way to control the problems of misunderstanding and bias in jury verdicts than attempting to blindfold the jury." *Id.* at 347 (quoting *Seppi v. Betty*, 99 *Idaho* 186, 579 *P.*2d 683, 692 (1978)).

This Court's insistence on an ultimate outcome charge in *Fischer v. Canario, supra,* 143 *N.J.* 235, 670 *A.*2d 516, arose in a context different from that which motivated the use of the charge in *Roman, supra. Fischer* involved a claim for damages on behalf of the decedent, Rachel Fischer, who died of metastatic lung cancer in 1988. Her administrator's complaint alleged that the defendants, Dr. Canario, an orthopedist, and Dr. Magid, a radiologist, deviated from accepted medical standards by failing to inform the decedent of the result of a chest x-ray, performed in connection with a 1984 hospital admission, that revealed a probable tumor. At trial, the parties stipulated that if the decedent's cancer had been diagnosed in 1984 she would have had a fifty-percent chance of survival. The plaintiff's expert testimony asserted that the defendant's failure to review the chest x-ray and inform the decedent of the probable tumor increased her risk of death and was a substantial factor in causing her death. *Id.* at 239, 670 *A.*2d 516. At the conclusion of trial, the plaintiff's counsel requested an ultimate outcome charge that would instruct the jury that, irrespective of the decedent's fifty-percent chance of survival without taking into account the defendants' negligence, the jury—assuming it found one or both of the defendants' negligence to be a substantial factor in causing the decedent's death—should award *in full* the damages to which it found the decedent to be entitled, after which the court would reduce the award to reflect the decedent's fifty-percent chance of cure. *Id.* at 253, 670 *A.*2d 516. The trial court declined to so instruct the jury. *Ibid.*

The jury determined that Dr. Canario, but not Dr. Magid, was negligent, that his negligence was a substantial factor in causing the decedent's death, and awarded damages of $134,231. The trial court declined to apply retroactively this Court's decision in *Scafidi v. Seiler*, 119 *N.J.* 93, 112–13, 574 *A.*2d 398 (1990), in which we held that "[t]o the extent that a plaintiff's ultimate harm may have occurred solely by virtue of a preexistent condition, without regard to a tortfeasor's intervening negligence, the defendant's liability for damages should be adjusted to reflect the likelihood of that outcome." The Appellate Division affirmed. *Fischer v. Canario*, 277 *N.J.Super.* 302, 310, 649 *A.*2d 875 (1994).

On appeal, we held that the *Scafidi* rule should apply to all cases tried after the date of that decision, 143 *N.J.* at 251, 670 *A.*2d 516, and that the lower courts erred in failing to apply *Scafidi* to mold the jury verdict. We also addressed the ultimate outcome charge issue, noting that the defendant acknowledged the appropriateness of an ultimate outcome charge in *Scafidi*-type cases but contended that the trial court's failure to give the charge constituted harmless error. *Ibid.* The Court summarized the plaintiff's argument in support of an ultimate outcome charge:

Plaintiff contends that an ultimate outcome charge was necessary because throughout the trial the jury heard testimony that, as of the date of the alleged malpractice, Mrs. Fischer had a fifty percent chance of cure. Plaintiff's counsel was concerned that the jury would likely infer from this testimony that plaintiff's total damages equalled half of what the total damages actually were. Because the court refused to give the ultimate outcome charge, plaintiff contends that the jury itself compromised its award to reflect the value of the lost chance.

[*Id.* at 253, 670 *A.*2d 516.]

In concluding that the trial court's failure to provide the jury with an ultimate outcome charge constituted reversible error mandating a retrial on damages, we observed:

The value of an ultimate outcome charge in lost-chance cases is that it informs the jurors of the effect of their causation apportionment. The charge makes clear to jurors that they are to award full damages, and the *trial court* will make any necessary adjustments in light of their findings. Without the charge, there is the risk that the jurors will reduce their damage award in light of the apportionment of fault they find as part of their verdict. Then, once the trial court makes the same reduction, the plaintiff would receive an inadequate recovery. When a *Scafidi*

damage-apportionment rule is applicable, an ultimate outcome charge generally should be given.

The trial court, in the exercise of its discretion, did not give an ultimate outcome charge because it concluded that such a charge would "tend to mislead or confuse the jury," because "[t]hey don't have to reach a conclusion of what percent the chance of survival was in this case." However, even though the jury did not decide the percentage of lost chance of recovery, an ultimate outcome charge would have clarified matters. It would have explicitly separated in the jury's mind the fifty percent stipulation from the damages award. Accordingly, we find that the trial court erred by declining to provide an ultimate outcome charge.

[*Id.* at 254, 670 *A.*2d 516.]

## II

This Court's opinion in *Roman, supra,* adverted to the growing trend in favor of providing ultimate outcome instructions to juries in comparative negligence cases. 82 *N.J.* at 346, 413 *A.*2d 322. The development of that trend contradicted early decisions by a number of state appellate courts holding that juries should not be informed of the legal effect of their answers in cases submitted to juries by the use of special verdicts. Wisconsin, one of the first states to adopt comparative negligence, was a firm advocate of the rule against ultimate outcome charges when special verdicts were used. *See McGowan v. Story,* 70 *Wis.*2d 189, 234 *N.W.*2d 325, 328–30 (1975). Other state courts expressed a similar hostility to the use of ultimate outcome charges. See *Argo v. Blackshear,* 242 *Ark.* 817, 416 *S.W.*2d 314, 315–16 (1967); *Avery v. Wadlington,* 186 *Colo.* 158, 526 *P.*2d 295, 297 (1974), *overruled by statute as stated in Mountain Mobile Mix, Inc. v. Gifford,* 660 *P.*2d 883, 887 (Colo.1983); *McCourtie v. United States Steel Corp.,* 253 *Minn.* 501, 93 *N.W.*2d 552, 563 (1958); *Grasso v. Cannon Ball Motor Freight Lines,* 125 *Tex.* 154, 81 *S.W.*2d 482, 487 (1935); *McGinn v. Utah Power & Light Co.,* 529 *P.*2d 423, 424 (Utah 1974), *overruled by Dixon v. Stewart,* 658 *P.*2d 591, 596–97 (Utah 1982). Until the 1970s, the practice of precluding the use of ultimate outcome charges in cases submitted to juries on special verdicts represented the majority rule throughout the country. *See* Stuart F. Schaffer, *Informing the Jury of the Legal Effect of Special Verdict*

*Answers in Comparative Negligence Actions,* 1981 *Duke L.J.* 824, 832–33.

The majority rule, however, was subjected to sharp criticism. Professor Leon Green, an early critic, expressed strong disagreement with the Texas rule prohibiting ultimate outcome instructions:

> No one would contend that the purpose of instructions should be to prejudice a case in favor of one party or the other. Nor would it be contended that the purpose of an explanatory instruction should be the direction of the jury to proceed to find for one party or the other without respect to the merits of the issue as supported by the law and the evidence. The purpose is to explain the issue so that its significance can be understood, intelligently considered and fairly determined. If so knowing the significance of issues, juries also know how to answer them for one party or the other, that is not only their right and a matter for their conscience, but it is likewise a right of the parties under the law. Admittedly jurors do understand the significance of most issues and are trusted to answer them honestly. What reason is there for not trusting them on complex issues if their significance is explained?
>
> . . . .
>
> It does not seem that the blindfold is a proper remedy for this evil, for there is no blindfold known that will prevent a jury from thinking they know the legal effect of their answers. The better remedy seems to be to inform a jury of the legal effect of the issue so that the evidence can be weighed with respect to that issue and its consequences. If they mistakenly think they know the significance of their answers, this false assumption results in a verdict they do not want and one out of line with the facts as the jury conceive[s] them to be. But if they know the legal effect of the issue, its effect and the evidence to support it are open for debate both by counsel and by the jurors themselves without emphasis on the end to be reached.
>
> [Leon Green, *Blindfolding the Jury,* 33 *Texas Law Rev.* 273, 281–83 (1955).]

Professor Charles Alan Wright also took issue with the majority rule:

> It hardly seems logical to restrict the discretion of the trial judge. Since he is free to choose either a general verdict with a general charge, or special verdicts with no charge, he should be permitted the intermediate device of special verdicts accompanied by a charge on the law. Judges who think that the jury is intended to reflect the voice of the man in the street may well prefer to follow this course.
>
> Finally, it must be evident that in most cases the jury will in fact know which party is favored by a particular answer. If plaintiff's counsel argues eloquently that there is no evidence of contributory negligence, even a juror who has never heard of the doctrine is likely to deduce that it will be in the plaintiff's interest for him to answer "No" to the question about contributory negligence. Interestingly the Minnesota court, in order to preserve its rule against letting the jury know the

effect of the answers, has found it necessary to hold that it is error for counsel expressly or by necessary implication to inform the jury which side will benefit from a particular answer. I find it difficult to imagine any argument counsel can make which will not have such an effect, at least by implication. Thus the attempt to keep the jury in the dark as to the effect of its answers is likely to be unavailing. Indeed the rule barring instructions on this point gives rise to the danger that the jury will guess wrong about the law, and may shape its answers to the special verdicts, contrary to its actual beliefs, in a mistaken attempt to ensure the result it thinks proper.

[Charles Alan Wright, *The Use of Special Verdicts in Federal Court*, 38 *F.R.D.* 199, 205–06 (1965)(footnotes omitted).]

Beginning in the mid 1970s, a number of cases were decided that permitted the use of ultimate outcome instructions in cases submitted on special verdicts, primarily in comparative negligence litigation. In *Porche v. Gulf Mississippi Marine Corp.*, 390 *F.Supp.* 624 (E.D.La.1975), involving the comparative negligence principles of admiralty law, the jury inquired whether the plaintiff would receive all damages awarded by the jury. The district court informed the jury that the damages would be reduced by the percentage of the plaintiff's contributory negligence, rejecting the contention that the jury should not be informed of the legal consequences of their answers:

There is some authority that, when a judge requires a jury to return a special verdict, under *F.R.Civ.P.* 49(a), the jury should not be informed of the legal consequences of [its] answers. But the better view is that a jury is entitled to know what effect its decision will have. The jury is not to be set loose in a maze of factual questions, to be answered without intelligent awareness of the consequences. One of the purposes of the jury system is to temper the strict application of law to facts, and thus bring to the administration of justice a common sense lay approach, a purpose ill-served by relegating the jury to a role of determining facts *in vacuo*, ignorant of the significance of [its] findings.

[*Id.* at 632 (citations omitted).]

In *Seppi v. Betty*, 99 *Idaho* 186, 579 *P.*2d 683, 691–92 (1978), the Idaho Supreme Court abandoned its earlier practice prohibiting ultimate outcome charges in cases submitted on special verdicts, holding that such charges would be permissible in comparative negligence litigation. In the course of its opinion, the court noted the growing trend in favor of ultimate outcome charges, and observed that several states, namely Colorado, Minnesota, North Dakota, Texas and Wyoming, had adopted statutes or rule amend-

ments that modified earlier decisions precluding the use of such charges. *Ibid.*

In addition to this Court's decision in *Roman, supra,* 82 *N.J.* at 346–47, 413 *A.*2d 322, a number of other state courts have authorized ultimate outcome charges in comparative negligence cases submitted on special verdicts. *See, e.g., Mountain Mobile Mix, supra,* 660 *P.*2d at 887; *LaFleur v. Farmington River Power Co.,* 187 *Conn.* 339, 445 *A.*2d 924, 925 n. 2 (1982); *Kaeo v. Davis,* 68 *Haw.* 447, 719 *P.*2d 387, 396 (1986); *Thomas v. Board of Twp. Trustees,* 224 *Kan.* 539, 582 *P.*2d 271, 280 (1978); *Rosenthal v. Kolars,* 304 *Minn.* 378, 231 *N.W.*2d 285, 287 n. 2 (1975); *Verner v. Nevada Power Co.,* 101 *Nev.* 551, 706 *P.*2d 147, 151 (1985); *Johnson v. Safeway Stores, Inc.,* 568 *P.*2d 908, 914 (Wyo.1977).

A relatively recent opinion of the Ninth Circuit Court of Appeals presents the issue in a context most analogous to the case before us. In *In re Aircrash in Bali, Indonesia,* 871 *F.*2d 812 (1989), Pan American World Airways, Inc. (Pan Am) appealed an adverse jury verdict rendered after a trial involving the crash of a Pan Am flight in which the crew and all the passengers were killed. Based on a prior ruling in the same litigation, *In re Aircrash in Bali, Indonesia,* 684 *F.*2d 1301, 1313 (9th Cir.1982), it was established that the trial would be governed by the provisions of the Warsaw Convention that limit damages in airline crashes to $75,000 per passenger except where the crash resulted from willful misconduct or where the passenger was not given adequate notice of the Convention's damages limitation. On appeal, Pan Am contended that the district court erred in instructing the jury that if it found against plaintiffs on the issue of willful misconduct the plaintiffs would be restricted by the damages limitation of the convention. In its answers to special interrogatories, the jury determined that Pan Am's management was liable for willful misconduct.

In sustaining the propriety of the district court's instruction, the Court of Appeals observed:

> Since the jury was charged with deciding whether Pan Am gave the passengers adequate notice of the damages limitation of the Warsaw Convention, the jury obviously had to be informed about that limitation.... If the jury had not been informed of the connection between the plaintiffs' arguments that Pan Am committed willful misconduct and the damages limitation, the jury would have deduced a connection on its own and it might have been erroneous. The district judge did not abuse his discretion when he decided to eliminate the risk that the jury would deduce an inaccurate connection between a finding of willful misconduct and the damages limitation. *See* 9 Wright & Miller, Federal Practice and Procedure § 2509, at 513 (1971) ("an attempt to keep the jury in the dark as to the effect of its answers is likely to be unavailing, and there is always the danger that the jury will guess wrong about the law, and may shape its answers to the special verdicts, contrary to its actual beliefs, in a mistaken attempt to ensure the result it deems desirable").

*[In re Aircrash, supra, 871 F.2d at 815.]*

Another federal court ruling reversing a jury verdict because the trial court failed to inform the jury concerning plaintiff's actual financial stake in the outcome demonstrates that ultimate outcome charges need not be avoided merely because they require specific reference to amounts of money. In *Vinieris v. Byzantine Maritime Corp.*, 731 *F.*2d 1061 (1984), the Second Circuit Court of Appeals set aside a portion of a jury verdict because of the trial court's failure to inform the jury of the financial magnitude of plaintiff's claim. Plaintiff was Chief Mate on a Greek merchant vessel and because of a dispute with the Captain he was confined to his cabin and allegedly was denied payment of wages amounting to $1,361.08. He recovered a verdict of $1,000 on a false imprisonment claim. He also sued to recover his lost wages and, pursuant to 46 *U.S.C.A.* § 596, to recover a penalty of two days pay for each day during which payment of wages was delayed. As of the date of the Second Circuit's opinion, the penalty amounted to approximately $144,000. Uninformed of the penalty despite appellant's request for a specific instruction explaining the nature of plaintiff's statutory claim, the jury found for plaintiff on the lost wages claim, resulting in a verdict in plaintiff's favor for lost wages plus the statutory penalty. Reversing the jury verdict, the Court of Appeals observed:

> Even those who advocate nondisclosure could hardly quarrel with the proposition that, when a party's intention is at issue, the jury should make its determination only after considering all the circumstances connected with the act charged....
>
> ... Equally important was the issue of credibility. The district judge denied appellant's motion for a new trial despite the fact that he "did not believe the plaintiff" and would have reached a different result. Had the jurors known, as did the judge, how large a financial stake plaintiff had in the outcome of the case, their reaction might have been the same as that of the judge. A jury should not be asked to weigh credibility with only half the facts on the scale.
>
> [*Id.* at 1065 (citations omitted).]

## III

In applying our decisions in *Roman* and *Fischer, supra,* to the issue posed by this appeal, it may be helpful to restate the analytical bases for those rulings. In *Roman,* the jury was asked to apportion fault between the twelve-year-old plaintiff who negligently rode his bicycle on the shoulder of the Turnpike and the owner of the dump truck who negligently failed to check the rear wheel lugs. The jury apportioned fault seventy-five percent to the plaintiff and twenty-five percent to Mitchell, a task that the jury obviously was capable of performing without being informed of the statutory provision that barred the plaintiff from any recovery if his negligence was greater than the negligence of Mitchell. As the Court noted, uninformed of the rule of law that barred the plaintiff's recovery, the jury may well have *assumed* that the plaintiff would be entitled to recover twenty-five percent of the damages awarded. 82 *N.J.* at 345, 413 *A.*2d 322. Thus, although the jury's lack of knowledge about the applicable rule of law did not impede its ability to apportion fault between the parties, its ignorance of the law may have affected significantly its ability to render what it *perceived* to be a just verdict. Underlying our holding in *Roman* was a clear policy choice, unstated but necessarily inferable from our decision. Because we understood that the apportionment of fault by a jury uninformed of the legal consequence of its verdict might result in a reasonable allocation of fault but also in an unjust verdict from the jury's perspective, we elected to define the jury function more broadly, requiring an ultimate outcome charge so that the jury would be aware of the

outcome that its verdict would produce. *Id.* at 345–47, 413 *A.*2d 322.

A similar analysis dictated the result in *Fischer.* Surely, the jury in *Fischer,* instructed as it was to award the total amount of damages resulting from Mrs. Fischer's death, could perform that deliberative function without knowing the *Scafidi* rule. As in *Roman,* there was a concern that the jury might have incorrectly assumed, contrary to law, that the plaintiff would be entitled to recover the full amount of damages awarded, a result that would be unjust in view of the decedent's fifty-percent chance of survival, and that in response to that assumption the jury reduced the damages award by fifty percent. *Fischer, supra,* 143 *N.J.* at 253, 670 *A.*2d 516. In requiring the ultimate outcome instruction in *Fischer,* this Court made the policy determination that the scope of the jury function was not limited to the ministerial determination of total damages, but that it extended to an interest in assuring that the ultimate outcome was just. Accordingly, we required the jury to be informed that the court would mold the verdict, reducing the damage award to reflect the decedent's fifty-percent chance of survival. *Id.* at 255, 670 *A.*2d 516.

The rationale for requiring an ultimate outcome charge on the retrial of this case is virtually identical to the rationale underlying our decisions in *Roman* and *Fischer.* The jury on retrial obviously would be capable of apportioning fault among St. Michael's Hospital, Nurse Forshage and Dr. Haddad without being informed of the statutory limitation on the Hospital's liability. However, as the Appellate Division observed, a jury uninformed of that limitation might

> conclude that plaintiff's full recovery can be had against the corporate party, which it may well assume to have the deeper pocket, and it may therefore believe that it can more certainly make the plaintiff whole without having to assign fault to individual doctors, nurses, and other staff members, who, although negligent, clearly intended no harm and who are hardworking and dedicated professionals doing difficult jobs under difficult circumstances.

> [*Weiss, supra,* 295 *N.J.Super.* at 229–30, 684 *A.*2d 994.]

As in *Roman* and *Fischer*, the jury on remand might or might not reach a verdict that is significantly influenced by a misperception of the ultimate outcome that would result from its verdict. In *Roman* and *Fischer*, we elected not to run the risk that the jury's verdict and the ultimate outcome would be incongruent. In those cases, as here, informing the jury of the relevant legal principle carried with it a risk that the jury would conform its fact-finding with the desired result. In *Roman*, the ultimate outcome charge might have encouraged the jury to reduce the plaintiff's percentage of fault below fifty percent. In *Fischer*, such a charge might have encouraged the jury artificially to increase its damages award based on the knowledge that the trial court would reduce it by half. In this case, an ultimate outcome charge might encourage the jury to reduce the apportionment of fault to the Hospital and increase its apportionment of fault to Dr. Haddad and Nurse Forshage.

In short, in each case the ultimate outcome charge is intended to avoid a jury verdict that, because of a legal principle unknown to the jury, would result in an outcome that the jury would find to be unjust; and in each case, providing the ultimate outcome charge to the jury carries with it the risk that the jury will distort its fact-finding function in order to achieve an outcome it believes to be fair to the parties. The Appellate Division's opinion thoughtfully and persuasively addresses the concern that a jury instructed with an ultimate outcome charge will subvert its fact-finding responsibilities:

> With respect to the "sympathy" factor that defendants fear, we say only this. Our entire system for the administration of justice is built upon our trust in the jury system and our abiding confidence that juries act conscientiously and diligently in following the instructions given them by the judge. We trust juries to find all kinds of facts—in life and death issues as well as the full range of less consequential ones. Our jurisprudence is committed to the proposition that juries can and will follow the judge's charge and will do so best if they understand the legal consequences of their findings. A jury's potential passion and prejudice that may favor one or the other of the parties can most effectively be averted by cautionary instructions accompanying a charge that tells it fully and correctly how the law will affect its findings of fact.

> [295 *N.J.Super.* at 232, 684 *A*.2d 994.]

The jury should be told explicitly and emphatically that the statutory limit on the Hospital's liability can have no bearing whatsoever on its apportionment of fault. Unquestionably, to inform the jury of the statutory limit on the Hospital's liability carries with it a risk that the jury artificially will distort its findings on liability to impose more fault on the individual defendants. But that risk is no greater than the risk that an uninformed jury will return a verdict that distorts the apportionment of fault in a misguided effort to achieve a result that the limitation of liability statute prohibits.

The Court's opinion argues that an instruction informing the jury about the dollar limitation on the Hospital's liability is an instruction that "focuses on money and not percentages of fault," and is highly prejudicial because it is analogous to informing the jury about whether a defendant's liability is covered by insurance. *Ante* at 479–81, 713 *A*.2d at 433–34. I find the Court's analogy to insurance coverage unpersuasive. An instruction about coverage would inform a jury that a verdict against a defendant will have little or no financial consequence, and will be collectible because insurance is available. The instruction at issue here informs the jury only that a statutory provision limits the liability of hospitals irrespective of the percentage of fault found by the jury. The distinction is obvious. The latter instruction, as in *Roman* and *Fischer*, informs the jury of a legal principle that may alter substantially the intended effect of the jury's verdict.

As for the proposed instruction's focus on money, that focus is simply the result of the statutory language. The principle at stake would be no different if the statute limited the Hospital's liability to ten *percent* of the damage award. In that instance, I assume the Court would find it difficult not to acknowledge the analogy to the question posed in *Roman*. But whether the limitation on the Hospital's liability is expressed in dollars or in a percentage of damages is irrelevant: in either case, the limitation derives from a legal principle unknown to the jury, and poses a significant risk that the jury verdict may result in an unjust

outcome. Given the choice, I would put my trust in a jury informed of the law and solemnly reminded of its duty to decide the factual issues solely on the basis of the evidence in the record. A jury not informed of the consequences of its verdict is handicapped in its effort to return a just verdict. A jury that understands the consequences of its verdict is far more likely to perform faithfully its function as the conscience of the community.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.

*For affirmance*—Justice STEIN—1.